2019V00253 /JMA/jw
CRAIG CARPENITO
United States Attorney
By:  Jordan M. Anger
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel:  (973) 645-2829
Fax: (973) 297-2042
Jordan.Anger@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Hon.** |
| **Plaintiff,** | : | **Civil Action No. 19-** |
| **v.** | : | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| **ONE 2015 JEEP WRANGLER, VIN 1C4HJWEG5FL589336;** | : | |
| | : | |
| **ONE 2017 POLARIS SLINGSHOT SL, VIN 57XAAPFA3H8124858;** | : | |
| **ONE 2015 HARLEY DAVIDSON FLHXSE CVO STREET GLIDE, VIN 1HD1PXN1XFB958701;** | : | |
| | : | |
| **ONE 2014 JEEP GRAND CHEROKEE OVERLAND, VIN 1C4RJFCT4EC211415; AND** | : | |
| **$20,316.00 IN U.S. CURRENCY,** | : | |
| **Defendants *in rem*.** | : | |

Plaintiff the United States of America, by its attorney, Craig Carpenito,

United States Attorney for the District of New Jersey, for its verified complaint

(the "Complaint") alleges, upon information and belief, as follows:

## I.  **NATURE OF THE ACTION**

1.     This action is brought by the United States of America seeking the

forfeiture of the following property:

      a.     The following vehicles (collectively, the "defendant
vehicles"):

           i.   One 2015 Jeep Wrangler, VIN 1C4HJWEG5FL589336;

          ii.   One 2017 Polaris Slingshot SL, VIN
57XAAPFA3H8124858;

        iii.   One 2015 Harley Davidson FLHXSE CVO Street Glide,
VIN 1HD1PXN1XFB958701; and

        iv.   One 2014 Jeep Grand Cherokee Overland, VIN
1C4RJFCT4EC211415; and

      b.     $20,316.00 in United States Currency (the "defendant
currency")

(hereinafter referred to collectively as the "defendants in rem" or the "defendant

property").

2.     The defendants in rem are subject to seizure and forfeiture to the

United States of America pursuant to 21 U.S.C. § 881(a)(6), which subjects to

forfeiture all moneys, negotiable instruments, securities, or other things of

value furnished or intended to be furnished by any person in exchange for a

controlled substance or listed chemical in violation of Title 21, Subchapter I, of

the United States Code; all proceeds traceable to such an exchange; and all

moneys, negotiable instruments, and securities used or intended to be used to

facilitate any violation of Title 21, Subchapter I, of the United States Code.

3.     In addition, the defendant vehicles are subject to forfeiture

pursuant to 21 U.S.C. § 881(a)(4), because they are conveyances, namely

vehicles, which were used, or were intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of a controlled dangerous substance in violation of Title 21, Subchapter I, of the United States Code,

## II. <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a).

5.     Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the District of New Jersey.

6.     The defendant currency is being held on deposit in the United States Marshals Service ("USMS") Seized Asset Deposit Fund at the Federal Reserve Bank.  The defendant vehicles are in the constructive custody of the USMS.  The defendant vehicles are in the custody of a USMS contractor in or around Scranton, Pennsylvania.

## III. <u>FACTS</u>

7.     The Federal Bureau of Investigation ("FBI") is currently involved in an investigation of a drug-trafficking conspiracy operating in and around the Bayshore area of Monmouth and Middlesex Counties, New Jersey.[1]  Two of the

---

1.  The "Bayshore area" refers to the Raritan Bayshore region of Middlesex and northern Monmouth Counties.  It includes the municipalities of Aberdeen, Perth Amboy, South Amboy, Atlantic Highlands, Hazlet, Highlands, Holmdel, Keansburg, Keyport, Matawan, Middletown, Old Bridge, and Union Beach, New Jersey.  These municipalities include certain unincorporated communities, including Cliffwood and Cliffwood Beach.  For instance, in common usage, Cliffwood is sometimes referred to as part of Keyport and sometimes as part of Aberdeen.

parties involved in this conspiracy are Guy Jackson ("Jackson"), also known as "Mike," and Lashawn Mealing ("Mealing"), also known as Lashawn Jackson.

8.      Jackson was a principal member of the drug-trafficking conspiracy who obtained significant quantities of heroin and cocaine, and re-distributed that heroin and cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.

9.      Mealing is Jackson's wife and was a principal member of the drug-trafficking conspiracy who worked with her husband to obtain and distribute significant quantities of heroin and cocaine.

10.      Beginning in or around February 2017, the FBI and other law enforcement agencies began investigating heroin and cocaine trafficking in and around the Bayshore area by Jackson, Mealing, and their co-conspirators.  As a result of their investigations, law enforcement agencies were able to identify Jackson as a major supplier of heroin and cocaine in the Bayshore area.  The investigation revealed that Jackson, Mealing, and their co-conspirators employed various methods to avoid detection by law enforcement, including using one or more buildings in and around the Bayshore area as "stash houses" and/or bases of operation to package, store, and distribute narcotics, and changing the cellular telephone numbers that they used to conduct unlawful drug-trafficking activities.

11.      As part of the investigation, law enforcement conducted court-ordered wiretaps of three telephone facilities held by Jackson over the course of the period between in or around July 2018 and in or around November 2018.

-4-

All of the communications between Jackson and his co-conspirators described below were intercepted pursuant to one of the court-ordered wiretaps.

12.    The investigation has revealed that Jackson and Mealing frequently changed their vehicles, including sometimes on a single day, in an effort to evade law enforcement detection of their illegal narcotics trafficking activity.

13.    The investigation has further revealed that Jackson and Mealing used the defendant vehicles, among others, to distribute heroin and cocaine in and around the Bayshore area in furtherance of their drug trafficking activities.

14.    On November 27, 2018, Jackson, Mealing, and others were charged by criminal complaint in the District of New Jersey, attached hereto as Attachment A, with conspiracy to distribute 100 grams or more of heroin, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), in violation of 21 U.S.C. § 846, and conspiracy to distribute 500 grams or more of cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), in violation of 21 U.S.C. § 846. *See United States v. Guy Jackson, et al.*, Mag. No. 18-5045 (TJB).

15.    On or about November 27, 2018, the Honorable Tonianne J. Bongiovanni, United States Magistrate Judge, issued seizure warrants for the defendant vehicles, executable in either the District of New Jersey or the Middle District of Pennsylvania, on the basis that there was probable cause to believe that the defendant vehicles are subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. §§ 853 and 881 for violations of 21 U.S.C. §§ 841

and 846.  Magistrate Judge Bongiovanni also issued a warrant to search the defendant Jeep Grand Cherokee in the District of New Jersey.

16.    Also on or about November 27, 2018, a United States Magistrate Judge in the Middle District of Pennsylvania issued a warrant to search Jackson and Mealing's residence in Effort, Pennsylvania.

17.    On November 28, 2018, the FBI arrested Jackson and Mealing at their residence in Effort, Pennsylvania, pursuant to arrest warrants issued by the Honorable Tonianne J. Bongiovanni, United States Magistrate Judge, District of New Jersey.

18.    In addition, on or about November 28, 2018, the defendant vehicles were seized by the FBI from Jackson and Mealing's residence in Effort, Pennsylvania pursuant to the November 27, 2018 seizure warrants.

19.    Because the defendant Jeep Grand Cherokee was found at Jackson and Mealing's residence in Effort, Pennsylvania, the Government sought, and a Magistrate Judge in the Middle District of Pennsylvania issued, a warrant to search the defendant Jeep Grand Cherokee in the Middle District of Pennsylvania.

20.    That same date, during the execution of the warrant to search Jackson and Mealing's residence, the FBI seized the defendant currency.

21.    After the FBI initiated administrative forfeiture proceedings against the defendants in rem, both Jackson and Mealing filed administrative claims to the defendant vehicles and the defendant currency in order to contest their forfeiture.

## IV. **THE DEFENDANT PROPERTY**

22.     Individuals engaged in drug trafficking often put their property in the names of others in order to conceal and disguise the identity and extent of their assets.  Doing so helps traffickers conceal wealth that cannot be attributed to legitimate sources.

23.     Drug traffickers also often maintain large amounts of United States currency on hand in order to maintain and finance their ongoing illegal activities, make purchases that cannot be traced to bank accounts or credit cards, pay bills, acquire assets, and make other purchases.  These funds are not necessarily kept in the "stash house," or in the same location as the narcotics.

24.     Dealing in cash also serves to conceal the existence, location, nature, source, and control of money earned from unlawful activity by keeping it out of the banking system and avoiding taxation and reporting requirements.

**A. 2015 Jeep Wrangler**

25.     Title information reveals that the 2015 Jeep Wrangler, VIN 1C4HJWEG5FL589336, is owned by Lashawn R. Mealing and Guy C. Jackson. Chrysler Capital holds a lien of approximately $4,588.15 on the 2015 Jeep Wrangler.

**i.    July 28, 2017**

26.     On July 28, 2017, at approximately 7:27 p.m., law enforcement observed the 2015 Jeep Wrangler enter a Rite Aid parking lot located on Smith

Street in Perth Amboy.  Law enforcement then observed the driver of the 2015 Jeep Wrangler conduct a narcotics transaction with a co-conspirator ("CC-1").

27.     At approximately 7:50 p.m., law enforcement positively identified the driver of the 2015 Jeep Wrangler as Jackson while he was driving along Route 35 South.

### ii.     April 11, 2018

28.     On April 11, 2018, at approximately 3:45 p.m., physical surveillance observed Jackson driving the 2015 Jeep Wrangler and entering the parking lot of the Bethany Towers located at the intersection of Route 36 and Broad Street, Keyport, New Jersey.

29.     At approximately 3:53 p.m., law enforcement observed a co-conspirator ("CC-2") enter the Bethany Towers parking lot, exit CC-2's vehicle, and enter the 2015 Jeep Wrangler to conduct a narcotics transaction with Jackson.

### iii.     August 8, 2018 (Transaction 1)

30.     On August 8, 2018, at approximately 1:47 p.m., Jackson received a text message from a co-conspirator ("CC-3") requesting a meeting with Jackson at around 3:00 p.m.  Jackson responded "Ok."

31.     At approximately 2:40 p.m., CC-3 asked Jackson where they were meeting and placed an order for half a gram of cocaine and two bags of heroin from Jackson.

32.     At approximately 3:31 p.m., Jackson replied that he would meet CC-3 in "Amboy" in twenty minutes at Rite Aid.

33.     At approximately 3:50 p.m., law enforcement observed Jackson on State Street in Perth Amboy, New Jersey near the 2015 Jeep Wrangler and carrying a backpack.  At approximately 4:11 p.m., law enforcement observed Jackson driving the 2015 Jeep Wrangler and arriving at the Rite Aid in Perth Amboy, New Jersey.

34.     At approximately 4:13 p.m., law enforcement observed CC-3 leaving the Rite Aid and heading onto Smith Street.

### iv.    August 8, 2018 (Transaction 2)

35.     At approximately 4:36 p.m., Jackson received an incoming call from a co-conspirator ("CC-4").  Jackson told CC-4 he would meet CC-4 in about twenty minutes or so.  At approximately 5:09 p.m., CC-4 called Jackson, and Jackson told CC-4 he was across the street.

36.     At approximately 5:15 p.m., physical surveillance observed Jackson arrive in the 2015 Jeep Wrangler and conduct a narcotics transaction with CC-4.

### B. 2017 Polaris Slingshot SL

37.     Title information reveals that the 2017 Polaris Slingshot, VIN 57XAAPFA3H8124858, is owned by Lashawn R. Mealing.

### ii.    August 15, 2018 (Transaction 1)

38.     On August 15, 2018, at approximately 1:39 p.m., law enforcement observed Jackson exiting an address on State Street in Perth Amboy, New

Jersey[2] (the "State Street Address") that the investigation has revealed to be a "stash house," and departing the area on the 2017 Polaris Slingshot.

39.     From approximately 11:17 a.m. to approximately 1:39 p.m., Jackson and a co-conspirator ("CC-5") conducted a text message exchange in which CC-5 ordered a brick[3] of heroin and half a gram of cocaine from Jackson, and Jackson told CC-5 that he was in "Amboy" and directed CC-5 to meet him at "Sidestreet 7-Eleven."

40.     At approximately 1:48 p.m., law enforcement observed Jackson arrive on the 2017 Polaris Slingshot and meet with CC-5 near the 7-Eleven on Herbert Street in Perth Amboy, New Jersey, and conduct a narcotics transaction.

### ii.     August 15, 2018 (Transaction 2)

41.     Also on August 15, 2018, from approximately 1:29 p.m. to approximately 2:09 p.m., Jackson and CC-3 exchanged text messages.  During that exchange, CC-3 ordered a bundle of heroin and half a gram of cocaine from Jackson, and the parties discussed where ("Taco Bell") and when to meet to conduct the narcotics transaction.

---

2. Based on open source records, the State Street Address was leased to Mealing.

3.  A "brick" of heroin typically contains approximately 50 smaller, individually packaged glassine envelopes or baggies containing heroin, which are bundled together in "bundles" of approximately ten envelopes or baggies, which are then wrapped and taped to form a small package, referred to as a brick.  A brick typically contains a total of approximately one to two grams of heroin.  All of the bricks of heroin involved in this narcotics conspiracy for which laboratory reports have been completed have been found to weigh more than two grams per brick.

42.     At approximately 2:10 p.m., law enforcement observed CC-3 arrive at a Taco Bell in Perth Amboy.  Law enforcement then observed Jackson arrive on the 2017 Polaris Slingshot and conduct a hand-to-hand narcotics transaction with CC-3 via the passenger side of CC-3's vehicle.

### iii.    **August 15, 2018 (Transaction 3)**

43.     Also on August 15, 2018, from approximately 5:09 p.m. to approximately 6:14 p.m., Jackson and CC-1 exchanged text messages.  CC-1 confirmed that CC-1 had $670 to spend on narcotics and/or to pay back Jackson amounts CC-1 owed from previous narcotics transactions, and the parties discussed where and when to meet to conduct the transaction.

44.     At approximately 6:19 p.m., law enforcement observed Jackson arrive on the 2017 Polaris Slingshot and meet with CC-1 at the Harbor Side Marina, Perth Amboy, New Jersey to conduct a narcotics transaction within CC-1's vehicle.

### iv.    **August 15, 2018 (Transaction 4)**

45.     At approximately 6:40 p.m., law enforcement observed Jackson, still at the Harbor Side Marina, meet with a co-conspirator ("CC-6") and another individual ("Individual-1") and conduct an apparent narcotics transaction.

46.     At approximately 7:22 p.m., law enforcement observed Jackson depart the Harbor Side Marina on the 2017 Polaris Slingshot and proceed to the State Street Address, where law enforcement observed Jackson's supplier

of narcotics arrive for a delivery of narcotics, which Jackson and his supplier had discussed earlier in the day over Jackson's wiretapped telephone.

**C. 2015 Harley Davidson FLHXSE CVO Street Glide**

47.     Title information for the 2015 Harley Davidson FLHXSE reveals that it is owned by Guy C. Jackson.

### iii.     October 19, 2018 (Transaction 1)

48.     On October 19, 2018, law enforcement observed Jackson and Mealing depart the State Street Address in a brown Honda that is not a defendant vehicle.  Between approximately 2:22 p.m. and approximately 2:35 p.m., law enforcement observed Jackson conduct multiple apparent narcotics transactions (corresponding to communications over Jackson's wiretapped telephone) through the front passenger window of the Honda while Jackson was in the driver's seat and Mealing was in the front passenger seat.

49.     Later that same day, at approximately 4:28 p.m., law enforcement observed Jackson meet with CC-6 in a parking lot near the Supremo Food Store in Perth Amboy, New Jersey.  Jackson was operating the 2015 Harley Davidson FLHXSE, having switched which vehicle he was using to conduct illegal narcotics transactions.

50.     Law enforcement observed Jackson entering the passenger side of CC-6's vehicle to conduct a narcotics transaction.  After several seconds, Jackson exited CC-6's vehicle and departed the area on the 2015 Harley Davidson FLHXSE.

### ii.    October 19, 2018 (Transaction 2)

51.    Earlier on October 19, 2018, at approximately 3:38 p.m., Jackson made an outgoing call to a co-conspirator ("CC-7").  CC-7 asked if Jackson was around, and Jackson told CC-7 that they would be meeting in Perth Amboy, New Jersey.

52.    At approximately 4:03 p.m., CC-7 ordered three bundles of heroin and four grams of cocaine from Jackson.

53.    At approximately 4:57 p.m., Jackson texted CC-7: "On my bike about to go to matawan you could just meet me over there."  Subsequently, at approximately 4:58 p.m., Jackson called CC-7 to coordinate their meeting.

54.    At approximately 5:06 p.m., physical surveillance observed Jackson arrive on the 2015 Harley Davidson FLHXSE and meet with CC-7 in the parking lot located in the vicinity of the Supremo Food Store in Perth Amboy, New Jersey.

### D. 2014 Jeep Grand Cherokee Overland

55.    Title information for the 2014 Jeep Grand Cherokee reveals that it is owned by Lashawn R. Mealing.

### iv.    March 23, 2018

56.    On or about March 23, 2018, at approximately 1:03 p.m., law enforcement observed Jackson and Mealing exit the State Street Address and get in the 2014 Jeep Grand Cherokee.  Jackson got into the driver's seat, Mealing got into the front passenger seat, and they departed the location.

-13-

57.     A few minutes later, law enforcement observed the 2014 Jeep Grand Cherokee traveling from the State Street Address in the direction of a car wash located on Route 35 and Smith Street, Perth Amboy, New Jersey (the "Car Wash").  A few minutes after that, at approximately 1:11 p.m., law enforcement observed the 2014 Jeep Grand Cherokee arrive at the Car Wash.

58.     Law enforcement observed CC-2 approach the passenger side window of the 2014 Jeep Grand Cherokee and conduct a narcotics exchange with Jackson, who was in the driver's seat, while Mealing was in the passenger seat.

## ii.     **August 10, 2018**

59.     On August 10, 2018, at approximately 12:56 p.m., CC-7 sent Jackson a text message to Jackson ordering two grams of cocaine and two bundles of heroin from Jackson.  Jackson responded, "Ok."  At approximately 1:44 p.m., Jackson texted CC-7: "Popeyes in 15 minutes."  CC-7 responded, "Ok."

60.     At approximately 2:21 p.m., law enforcement observed Jackson departing the State Street Address carrying a backpack.  Jackson entered the 2014 Jeep Grand Cherokee and departed the area.

61.     At approximately 2:27 p.m., Jackson arrived at a Popeye's and met with CC-7.  Law enforcement then observed Jackson conduct a hand-to-hand narcotics transaction with CC-7.

-14-

### iii. __October 26, 2018__

62.     On October 26, 2018, at approximately 2:58 p.m., Jackson called CC-3 and instructed CC-3 to meet him at "the food store" in five minutes.  CC-3 ordered one bundle of heroin and one gram of cocaine from Jackson.

63.     At approximately 3:22 p.m., law enforcement observed Jackson in the 2014 Jeep Grand Cherokee meeting with CC-3 in the Supremo Food Store parking lot in Perth Amboy, New Jersey.  Law enforcement observed CC-3 get into the 2014 Jeep Grand Cherokee to conduct a narcotics transaction with Jackson.

### iv. __October 29, 2018__

64.     On or about October 29, 2018, at approximately 9:59 a.m., Jackson sent a text message to CC-3 asking what time CC-3 would be ready today.  CC-3 responded that CC-3 was ready now.  Jackson then asked CC-3's order, to which CC-3 responded that CC-3 wanted one bundle of heroin and one gram of cocaine.  CC-3 also told Jackson that CC-3 had the $520 that CC-3 owed him.

65.     At approximately 11:17 a.m., law enforcement observed Jackson in the 2014 Jeep Grand Cherokee meeting with CC-3 in the Supremo Food Store parking lot in Perth Amboy, New Jersey to conduct a narcotics transaction.

## E. __The Defendant Currency__

66.     On or about November 28, 2018, during the execution of the warrant to search Jackson and Mealing's residence, the FBI seized the defendant currency.

67.    In addition to the defendant currency, the FBI also seized, *inter alia*, numerous cellular telephones, a money counter, a digital scale, and packaging material, which are items typically found in the home of a narcotics trafficker.

68.    FBI discovered $5,000.00 of the defendant currency within a women's jacket in the bedroom closet.  FBI found $15,088.00 of the defendant currency in a dresser of the same bedroom.  The remaining $228.00 in United States currency was located on the kitchen table.

69.    The investigation has revealed that Jackson obtained in excess of 400 bricks of heroin for distribution during the period of in or around July 2018 through in or around November 2018, at a price of approximately $160 per brick.  Jackson then sold the heroin for approximately $220 per brick, or a greater per-brick price if the purchaser bought smaller quantities.  Accordingly, Jackson netted at least approximately $60 per brick, or more than $24,000, during that time period.

70.    Additionally, the investigation has revealed that Jackson obtained in excess of one kilogram of cocaine for distribution during the period of in or around July 2018 through in or around November 2018, and that Jackson netted several dollars (up to approximately $20 or more) per gram of cocaine he resold, depending on the quantity the purchaser bought at once.  Accordingly, Jackson netted several thousand dollars from the sale of cocaine during that time period.

-16-

71.     The investigation has revealed that both Jackson and Mealing have a prior criminal history in the State of New Jersey.

72.     Mealing has five felony convictions in New Jersey since 1999, including, among other charges, convictions for distribution of heroin/cocaine, possession of a controlled dangerous substance, and manufacturing and/or distributing a controlled dangerous substance.

73.     Jackson has seven felony convictions in New Jersey since 1991, including, among other charges, convictions for conspiracy to commit a drug offense, distribution of heroin/cocaine, possession of a controlled dangerous substance in a school zone, and manufacturing and/or distributing a controlled dangerous substance.

74.     Prior to being criminally charged in this district, both Mealing and Jackson were arrested together on two previous occasions for drug trafficking offenses.  First, both were arrested on or about January 30, 2003, in Woodbridge Township, New Jersey, for which Mealing received five years' probation and Jackson received a sentence of twelve years in state prison.

75.     The second arrest occurred on March 19, 2014, in Old Bridge Township, New Jersey.  The indictment for those charges is still pending against Jackson, Mealing, and another individual in Middlesex County Superior Court.

76.      During the relevant time period, Department of Labor database searches in the State of New Jersey and the Commonwealth of Pennsylvania show no reported earnings for Mealing or Jackson.

-17-

## V.  <u>FIRST CLAIM FOR FORFEITURE</u>

77.    The allegations contained in paragraphs 1 through 76 of this Complaint are incorporated herein and made part hereof.

78.    As a result of the foregoing, the defendants in rem are subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6) as moneys or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of Title 21, Subchapter I, of the United States Code; proceeds traceable to such an exchange; and/or moneys used or intended to be used to facilitate any violation of Title 21, Subchapter I, of the United States Code.

## VI.  <u>SECOND CLAIM FOR FORFEITURE</u>

79.    The allegations contained in paragraphs 1 through 76 of this Complaint are incorporated herein and made part hereof.

80.    As a result of the foregoing, the defendant vehicles are subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(4) as conveyances, namely vehicles, which were used, or were intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of a controlled dangerous substance in violation of Title 21, Subchapter I, of the United States Code.

WHEREFORE, the United States of America requests that the Clerk of the Court issue a warrant for the arrest and seizure of the defendants in rem pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure,

which the plaintiff will execute upon the defendants in rem pursuant to 28

U.S.C. § 1355(d) and Supplemental Rule G(3)(c); that notice of this action be

given to all persons who reasonably appear to be potential claimants to the

defendants in rem; that the defendants in rem be forfeited and condemned to

the United States of America; that the plaintiff be awarded its costs and

disbursements in this action; and that the Court grant such other and further

relief it deems just and proper.

Dated:  Newark, New Jersey
        May 20, 2019

CRAIG CARPENITO
United States Attorney


*s/Jordan M. Anger*
By:  JORDAN M. ANGER
Assistant U.S. Attorney

## **VERIFICATION**

STATE OF NEW JERSEY      )
COUNTY OF ESSEX         : ss.:
DISTRICT OF NEW JERSEY   )

DETECTIVE SEAN O'NEILL, being duly sworn, deposes and says that he is a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in enforcing the criminal laws; that he has been deputized as a Special Federal Officer by the Federal Bureau of Investigation, and as such has responsibility for this action; that he has read the foregoing Complaint and knows the contents thereof; and that the same is true to the best of his own knowledge, information and belief.

The sources of deponent's information on the ground of his belief are official records and files of the Federal Bureau of Investigation, the State of New Jersey, and the United States Government, and information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Title 21, United States Code.

Detective Sean O'Neill
Task Force Officer
Federal Bureau of Investigation

Sworn to and subscribed before me
This 17th day of May, 2019
at Newark, New Jersey

Jaclyn N. Wyrwas
Attorney-at-Law of the State of New Jersey

# ATTACHMENT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | :    CRIMINAL COMPLAINT |
| v. | :    Mag. No. 18-5045 (TJB) |
| GUY JACKSON,<br>    a/k/a "Mike";<br>GREGORY GILLENS;<br>LASHAWN MEALING,<br>    a/k/a "Lashawn Jackson";<br>RICHARD GETHERS,<br>    a/k/a "Richie,"<br>    a/k/a "Bart";<br>DEBERAL ROGERS,<br>    a/k/a "Debbie Rogers";<br>KRYSTAL CORDOBA;<br>DANIEL ALFANO;<br>DANIEL MCHUGH;<br>TYLER SCARANGELLO;<br>DAVID NAGY;<br>CHRISTY DUBE,<br>    a/k/a "Christy Lynch";<br>GEORGE HOLIDAY, SR.;<br>DARYL JACKSON,<br>    a/k/a/ "D-Mac";<br>SHAVAR WILLIAMS; and<br>BRIAN HALL | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

RECEIVED
NOV 27 2018
AT 8:30 —————— M
WILLIAM T. WALSH
CLERK

I, Ronald J. Duce, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about the dates set forth in Attachment A to this complaint, in the District of New Jersey and elsewhere:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

RONALD J. DUCE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE
NOVEMBER 27, 2018
TRENTON, NEW JERSEY

HON. TONIANNE J. BONGIOVANNI
UNITED STATES MAGISTRATE JUDGE

2

## ATTACHMENT A

### Count One
(Conspiracy - Heroin)

From at least in or around May 2017 to in or around November 2018, in Monmouth County and Middlesex County, in the District of New Jersey and elsewhere, the defendants,

GUY JACKSON, a/k/a "Mike";
GREGORY GILLENS;
LASHAWN MEALING, a/k/a "Lashawn Jackson";
RICHARD GETHERS, a/k/a "Richie," a/k/a "Bart";
DEBERAL ROGERS, a/k/a "Debbie Rogers";
KRYSTAL CORDOBA;
DANIEL ALFANO;
DANIEL MCHUGH;
TYLER SCARANGELLO;
DAVID NAGY;
CHRISTY DUBE, a/k/a "Christy Lynch";
GEORGE HOLIDAY, SR.;
SHAVAR WILLIAMS; and
BRIAN HALL,

did knowingly and intentionally conspire with each other and others known and unknown to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

## Count Two

### (Conspiracy - Cocaine)

From at least in or around May 2017 to in or around November 2018, in Monmouth County and Middlesex County, in the District of New Jersey and elsewhere, the defendants,

GUY JACKSON, a/k/a "Mike";
GREGORY GILLENS;
LASHAWN MEALING, a/k/a "Lashawn Jackson";
RICHARD GETHERS, a/k/a "Richie," a/k/a "Bart";
DEBERAL ROGERS, a/k/a "Debbie Rogers";
KRYSTAL CORDOBA;
DANIEL ALFANO;
DANIEL MCHUGH;
TYLER SCARANGELLO;
DAVID NAGY;
CHRISTY DUBE, a/k/a "Christy Lynch";
GEORGE HOLIDAY, SR.;
DARYL JACKSON, a/k/a "D-Mac";
SHAVAR WILLIAMS; and
BRIAN HALL,

did knowingly and intentionally conspire with each other and others known and unknown to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

In violation of Title 21, United States Code, Section 846.

4

ATTACHMENT B

I, Ronald J. Duce, am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 1998. I have been involved personally in the investigation of this matter. The information contained in this complaint is based on my personal knowledge and on information obtained from other sources, including: (i) statements made or reported by various witnesses with knowledge of relevant facts; (ii) my review of documents and evidence obtained through court orders, subpoenas, and other sources; (iii) assistance provided to law enforcement by multiple confidential sources of information deemed credible and reliable; and (iv) my review of wire and electronic communications intercepted pursuant to court-authorized wiretaps. Because this complaint is submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in sum and substance and in part, and the statements set forth herein are based on preliminary summaries and quotations of those communications.

## I. BACKGROUND

1.      From at least as early as in or around May 2017 to the present, the above-captioned defendants, and others known and unknown, combined, conspired, and agreed to distribute and possess with intent to distribute controlled substances, including at least 100 grams of heroin and 500 grams of cocaine, in and around the Bayshore area of New Jersey and beyond.[1]

2.      In furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to obtain—and did obtain—significant quantities of heroin, as well as cocaine and other controlled substances. Also in furtherance of the drug-trafficking conspiracy, the co-conspirators agreed to distribute—and did distribute—those narcotics, for profit, to other co-conspirators, various dealers, sub-dealers, and end users in and around the Bayshore area and elsewhere.

3.      Although the conspiracy operated throughout the Bayshore area and surrounding municipalities, the conspiracy operated principally in several

---

[1] In this Complaint, the "Bayshore area" refers to the Raritan Bayshore region of Middlesex and northern Monmouth Counties. It includes the municipalities of Aberdeen, Perth Amboy, South Amboy, Atlantic Highlands, Hazlet, Highlands, Holmdel, Keansburg, Keyport, Matawan, Middletown, Old Bridge, and Union Beach, New Jersey. These municipalities include certain unincorporated communities, such as Cliffwood and Cliffwood Beach. For instance, in common usage, Cliffwood is sometimes referred to as part of Keyport and sometimes as part of Aberdeen.

locations, first centering in and around the Cliffwood Beach/Keyport area and later centering in and around the Perth Amboy/South Amboy/Woodbridge area.

4.     At all times relevant to this complaint:

a.     GUY JACKSON, a/k/a "Mike," was a principal member of the drug-trafficking conspiracy who obtained significant quantities of heroin and cocaine from defendant GREGORY GILLENS, and re-distributed that heroin and cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.  JACKSON used numerous telephone facilities (collectively, the "JACKSON Facilities") to communicate in furtherance of the conspiracy, including but not limited to:

| Name | Beginning date (approx.) | Ending date (approx.) |
|---|---|---|
| JACKSON 9387 Facility[2] | 11/28/2017 | 1/28/2018 |
| JACKSON 2530 Facility | 1/25/2018 | 3/26/2018 |
| JACKSON 2256 Facility | 3/26/2018 | 4/22/2018 |
| JACKSON 9362 Facility | 4/22/2018 | 5/15/2018 |
| JACKSON 0605 Facility | 5/15/2018 | 6/14/2018 |
| JACKSON 4447 Facility | 6/14/2018 | 6/28/2018 |
| JACKSON 4655 Facility | 6/28/2018 | 8/27/2018 |
| JACKSON 8569 Facility | 8/27/2018 | 9/24/2018 |
| JACKSON 8537 Facility | 9/24/2018 | 11/12/2018 |
| JACKSON 8329 Facility | 11/12/2018 | present |

b. .   GREGORY GILLENS was a principal member of the drug-.trafficking conspiracy who supplied large quantities of heroin and cocaine to JACKSON for further distribution.  GILLENS used a telephone facility ending in 6542 (the "GILLENS 6542 Facility") to communicate in furtherance of the conspiracy.

c.     LASHAWN MEALING, a/k/a "Lashawn Jackson," was a principal member of the drug-trafficking conspiracy who worked with her husband, JACKSON, to obtain and distribute significant quantities of heroin and cocaine.  MEALING is a former corrections officer in Monmouth County.

d.     RICHARD GETHERS, a/k/a "Richie," a/k/a "Bart," was a principal member of the drug-trafficking conspiracy who, along with DEBERAL ROGERS, obtained significant quantities of heroin and cocaine from GILLENS,

---

[2] Each JACKSON Facility is named for the last four digits of the telephone number JACKSON used.

6

and re-distributed that heroin and cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users.

      e.    DEBERAL ROGERS, a/k/a "Debbie Rogers," was a principal member of the drug-trafficking conspiracy who, along with RICHARD GETHERS, obtained significant quantities of heroin and cocaine from GILLENS, and re-distributed that heroin and cocaine, for profit, to other members of the conspiracy, and various dealers, sub-dealers, and end users. GETHERS and/or ROGERS used a telephone facility ending in 9244 and subscribed to by ROGERS (the "ROGERS 9244 Facility") to communicate in furtherance of the conspiracy.

      f.    KRYSTAL CORDOBA was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. CORDOBA used at least two telephone facilities, one ending in 7867 (the "CORDOBA 7867 Facility") and the other ending in 5758 (the "CORDOBA 5758 Facility"), to communicate in furtherance of the conspiracy.

      g.    DANIEL ALFANO was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. ALFANO used at least two telephone facilities, one ending in 0744 (the "ALFANO 0744 Facility") and the other ending in 2292 (the "ALFANO 2292 Facility"), to communicate in furtherance of the conspiracy.

      h.    DANIEL MCHUGH was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. MCHUGH used a telephone facility ending in 5497 (the "MCHUGH 5497 Facility"), to communicate in furtherance of the conspiracy.

      i.    TYLER SCARANGELLO was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. SCARANGELLO used a telephone facility ending in 9959 (the "SCARANGELLO 9959 Facility"), to communicate in furtherance of the conspiracy.

      j.    DAVID NAGY was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. NAGY used a telephone facility ending in 3113 (the "NAGY 3113 Facility"), to communicate in furtherance of the conspiracy.

      k.    CHRISTY DUBE, a/k/a "Christy Dube," was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. DUBE used at least two telephone facilities, one ending in 0617 (the "DUBE 0617 Facility") and the other ending in 0188 (the "DUBE 0188 Facility"), to communicate in furtherance of the conspiracy.

l. GEORGE HOLIDAY, SR. was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. HOLIDAY used a telephone facility ending in 4759 (the "HOLIDAY 4759 Facility"), to communicate in furtherance of the conspiracy.

m. DARYL JACKSON, a/k/a "D-Mac" ("D. JACKSON"), was a member of the drug-trafficking conspiracy who purchased cocaine from JACKSON for further distribution. D. JACKSON used a telephone facility ending in 0346 (the "D. JACKSON 0346 Facility"), to communicate in furtherance of the conspiracy.

n. SHAVAR WILLIAMS was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. WILLIAMS used a telephone facility ending in 6678 (the "WILLIAMS 6678 Facility"), to communicate in furtherance of the conspiracy.

o. BRIAN HALL was a member of the drug-trafficking conspiracy who purchased heroin and cocaine from JACKSON for further distribution. HALL used a telephone facility ending in 2619 (the "HALL 2619 Facility"), to communicate in furtherance of the conspiracy.

5. Law enforcement's investigation of the drug-trafficking conspiracy included the use of court-authorized wiretaps, numerous controlled purchases of heroin and other narcotics from multiple co-conspirators, consensually recorded telephone calls and text messages, physical and video surveillance, information provided by multiple confidential sources of information deemed credible and reliable, and other investigative techniques. The investigation has revealed the manner and means by which members of the conspiracy carried out the organization's unlawful drug-trafficking activities. Among other things, members of the conspiracy did the following in furtherance of the conspiracy's unlawful objectives:

a. obtained quantities of heroin and cocaine from GILLENS and JACKSON;

b. used various residences and vehicles to store and distribute heroin and other narcotics; cash proceeds of heroin and narcotics sales; and narcotics packaging paraphernalia in furtherance of their drug-trafficking activities;

c. distributed packaged heroin and other narcotics to others in and around eastern Monmouth and Middlesex Counties, New Jersey; and

d. took affirmative steps to avoid detection by law enforcement, including using prepaid cellular telephones with fictitious or no subscriber

8

information, counter surveillance of law enforcement vehicles and speaking in coded language to disguise the illicit nature of their discussions.

## II. CONTROLLED PURCHASES

6.     Multiple confidential sources of information assisted law enforcement during this investigation, including by conducting controlled purchases of heroin and, in one instance, cocaine, from defendants JACKSON, CORDOBA, and ALFANO.  The information and assistance provided during the investigation by these confidential sources of information has been corroborated through other evidence obtained during the investigation, including court-authorized wiretaps, physical surveillance, and consensually recorded calls and meetings.

7.     Based on controlled purchases from each of them, CORDOBA and ALFANO usually followed a similar modus operandi.  They met with narcotics purchasers in one location and obtained the funds for the transaction from the buyer.  They then departed to obtain the narcotics.  As discussed in more detail below, law enforcement believes that they then purchased the narcotics from JACKSON.  Either at the initial meeting or later via electronic or telephonic means, CORDOBA and ALFANO notified their buyer of the location where they should meet for CORDOBA or ALFANO to provide the purchaser with the narcotics.  The locations where the narcotics were exchanged were usually different from the locations where the funds were exchanged.  In this way, the defendants attempted to avoid detection because, during most transactions, the money and the narcotics changed hands at two different times and two different locations.  Moreover, using this modus operandi, the defendants and their co-conspirators were able to reduce the amount of time during which they had narcotics in their physical possession.

### A.     Controlled Purchases from CORDOBA

8.     Between in or around May 2017 and in or around July 2017, law enforcement executed approximately nine controlled purchases of suspected heroin from CORDOBA.  The suspected heroin purchased from CORDOBA bore several ink stamps, including, but not limited to, "POKEMON GO," "PLAYBOY," and "BUTTER."[3]  Two of these controlled purchases, which were consensually recorded by a confidential source ("CS-1"), are described in the paragraphs below.

---

[3] Heroin is often identified by an ink "stamp" on the individual baggies containing the heroin.  Heroin dealers and users often use these stamps to establish a brand or marketing for the source of that heroin.  Sales by different individuals of packages of heroin bearing the same stamp indicate coordination amongst those individuals and a common source of the same heroin supply.

9.    In or around May 2017, CS-1, acting at the direction of law enforcement, communicated using a social media messaging program with CORDOBA, and CORDOBA agreed to sell CS-1 a quantity of heroin. CORDOBA instructed CS-1 to meet her near a particular intersection in or around Holmdel, New Jersey. Law enforcement observed a vehicle known to be registered to CORDOBA arrive at and depart from a residence nearby where CORDOBA often stays, and proceed toward the agreed-upon meeting location. CORDOBA was positively identified as the driver of the vehicle. Law enforcement then observed CS-1 proceed toward the agreed-upon meeting location. A few minutes later, CS-1 advised law enforcement that the transaction was complete. Law enforcement observed CORDOBA's vehicle return to the residence.

10.    CS-1 subsequently met with law enforcement and provided the two bundles of suspected heroin that CS-1 purchased from CORDOBA.[4]  The suspected heroin bore a "POKEMON GO" stamp.

11.    Laboratory analysis of the suspected heroin that CS-1 purchased from CORDOBA indicated that the substance was positive for both heroin and fentanyl. Fentanyl is a synthetic opioid that has varying but often very high levels of potency. Even a very small amount of fentanyl—which can be inhaled or absorbed through the skin—can result in severe adverse reactions for those who come into contact with it. The net weight of the two bundles of heroin was approximately 0.95 grams, which is equivalent to approximately 2.37 grams per "brick."

12.    In or around July 2017, CS-1, acting at the direction of law enforcement, communicated with CORDOBA (who was using the CORDOBA 7867 Facility), and CORDOBA agreed to sell CS-1 a quantity of heroin. Law enforcement observed CS-1 and CORDOBA meet at a location in or around Keansburg, New Jersey, where CS-1 provided CORDOBA with the funds for the narcotics. CORDOBA then departed, and law enforcement observed her proceed north, making her way to Route 35 North. Law enforcement observed CORDOBA meet with a white male near a restaurant on Route 35 North, and then proceed further north. Law enforcement observed CORDOBA's vehicle parked in or around Keyport, directly behind a vehicle known to be used by JACKSON.

13.    CORDOBA then departed that location and proceeded south. CORDOBA instructed CS-1 to meet her at a different location in or around

---

[4] A "brick" of heroin typically contains approximately 50 smaller, individually packaged glassine envelopes or baggies containing heroin, which are bundled together in "bundles" of approximately ten envelopes or baggies, which are then wrapped and taped to form a small package, referred to as a brick. A brick typically contains a total of approximately one to two grams of heroin.

10

Hazlet. CORDOBA met CS-1 at that location, provided the suspected narcotics, and then departed. CORDOBA later met the same white male at the same restaurant where she had stopped earlier on her way north.

14. CS-1 subsequently met with law enforcement and provided the one brick of suspected heroin that CS-1 purchased from CORDOBA. The suspected heroin bore a "CHERRY BOMB" stamp.

15. Laboratory analysis of the suspected heroin that CS-1 purchased from CORDOBA indicated that the substance was positive for both heroin and fentanyl. The net weight of the brick of heroin obtained during this controlled purchase was approximately 2.35 grams.

16. Based on the investigation, I believe that CORDOBA obtained funds to purchase narcotics from CS-1 and from the white male she met at the restaurant, then went to purchase the narcotics from JACKSON, then returned to deliver the narcotics to CS-1 and the white male, respectively.

## B. Controlled Purchases of Heroin From ALFANO

17. Between in or around September 2017 and in or around April 2018, law enforcement executed more than a dozen controlled purchases of suspected heroin from ALFANO. The suspected heroin purchased from ALFANO bore several ink stamps, including, but not limited to, "POKEMON GO," "PLAYBOY," "BUTTER," and "357." Two of these controlled purchases, which consensually were recorded by a confidential source ("CS-2"), are described in the paragraphs below.

18. In or around September 2017, CS-2, acting at the direction of law enforcement, communicated via telephone with ALFANO (who used the ALFANO 0744 Facility), and ALFANO agreed to sell CS-2 a quantity of heroin and to meet at a particular location for CS-2 to provide ALFANO with the funds for the heroin.

19. Law enforcement established surveillance at the agreed-upon location for the transaction, and observed CS-2 exit his/her vehicle and get into ALFANO's vehicle. CS-2 gave ALFANO the funds for the heroin, and ALFANO counted the money at CS-2's request. CS-2 exited ALFANO's vehicle and advised law enforcement that ALFANO had accepted the funds. Law enforcement observed ALFANO proceed north, eventually pulling into a car wash (the "Car Wash") on Smith Street in Perth Amboy, New Jersey. Law enforcement discontinued surveilling ALFANO after CS-2 called law enforcement to state that ALFANO had told CS-2 that he thought he was being followed by police.

11

20.    CS-2 then met ALFANO at a different location from where he/she had provided the funds to ALFANO.  ALFANO provided CS-2 with the suspected narcotics.  CS-2 subsequently met with law enforcement and provided the suspected heroin that CS-2 purchased from ALFANO.  The suspected heroin was wrapped in magazine paper, with a "POKEMON GO" stamp.

21.    On or about March 23, 2018, CS-2, acting at the direction of law enforcement, communicated via telephone with ALFANO (who used the ALFANO 0744 Facility), and ALFANO agreed to sell CS-2 a quantity of heroin and to meet at a particular location for CS-2 to provide ALFANO with the funds for the heroin.

22.    Law enforcement established surveillance at the agreed-upon location for the transaction, and observed CS-2 exit his/her vehicle and give ALFANO the money for the heroin.  CS-2 and ALFANO agreed to meet at another location, where ALFANO would give CS-2 the heroin.  Law enforcement observed ALFANO proceed north, eventually pulling into the Car Wash.

23.    Meanwhile, other law enforcement officers surveilled an address on State Street in Perth Amboy that the investigation has revealed is likely a stash house of JACKSON's (the "State Street Address").  A trash pull at the State Street Address in or around February 2018 revealed two sandwich bags containing a white powder that field tested positive for cocaine, a cigar containing suspected marijuana, tape and magazine paper commonly used to package bricks of heroin for distribution, and utility bills addressed to MEALING (using the name "Lashawn Jackson") at the State Street Address.

24.    On or about March 23, 2018, law enforcement observed JACKSON and MEALING exit the State Street Address and enter a vehicle registered to MEALING.  JACKSON got into the driver's seat, MEALING got into the front passenger seat, and they departed the location.  A few minutes later, law enforcement observed JACKSON and MEALING's vehicle traveling from the State Street Address in the direction of the Car Wash.  A few minutes after that, law enforcement observed the vehicle arrive at the Car Wash.

25.    Law enforcement observed ALFANO approach the passenger side window of a vehicle and conduct an exchange with JACKSON, who was in the driver's seat, while MEALING was in the passenger seat.

26.    CS-2 then met ALFANO at the agreed-upon location.  CS-2 walked up to the driver's side door of ALFANO's vehicle, and ALFANO provided CS-2 with the suspected narcotics.  CS-2 subsequently met with law enforcement and provided the suspected heroin that CS-2 purchased from ALFANO.  The suspected heroin was wrapped in magazine paper and stamped with the words "POKEMON GO," "BUTTER," and "357."

## C.    Controlled Purchase From JACKSON

27.    During the investigation, law enforcement executed one controlled purchase of suspected heroin and cocaine from JACKSON.  This transaction, which was consensually recorded by a confidential source, is described below.

28.    In or around December 2017, JACKSON called CS-2 from a blocked number, later determined to be the JACKSON 9387 Facility.  The call was not recorded.  According to CS-2, JACKSON offered to sell narcotics directly to CS-2 for a better price than ALFANO was giving CS-2.

29.    Acting at the direction of law enforcement, CS-2 conducted a controlled purchase of narcotics from JACKSON.  JACKSON called CS-2 from a blocked number, later determined to be the JACKSON 9387 Facility.  JACKSON instructed CS-2 to drive to a particular location and wait for his call.  The call was not recorded, but law enforcement was present with CS-2, and the call took place over speaker phone.

30.    JACKSON later called CS-2 from what was later determined to be the JACKSON 9387 Facility and instructed CS-2 to go to a particular residence.  The call was recorded.  CS-2 and JACKSON met at that location.  The meeting was recorded.  CS-2 provided the funds to JACKSON, and JACKSON provided the suspected narcotics to CS-2.

31.    CS-2 subsequently met with law enforcement and provided the suspected heroin and cocaine that CS-2 purchased from JACKSON.  The heroin was wrapped in magazine paper and stamped with the words "VIPER" and "7-11."  The suspected cocaine field tested positive for cocaine.

## II.    WIRETAPS

32.    From in or around June 2018 to in or around November 2018, law enforcement, acting pursuant to wiretap orders entered by the United States District Court for the District of New Jersey, intercepted wire and electronic communications over the following cellular telephone facilities, which ALFANO, JACKSON, and GILLENS used in furtherance of the conspiracy:

a.    From in or around June 2018 to in or around August 2018, law enforcement intercepted telephone calls and text messages over the ALFANO 0744 Facility, which ALFANO used to communicate with his co-conspirators and others in furtherance of the conspiracy.

b.    From in or around June 2018 to in or around July 2018, law enforcement intercepted telephone calls and text messages over the ALFANO 2292 Facility, which ALFANO used during a short period of time to

13

communicate with his co-conspirators and others in furtherance of the conspiracy.

      c.    From in or around July 2018 to in or around August 2018, law enforcement intercepted telephone calls and text messages over the JACKSON 4655 Facility, which JACKSON used to communicate with his co-conspirators and others in furtherance of the conspiracy.

      d.    In or around September 2018, law enforcement intercepted telephone calls and text messages over the JACKSON 8569 Facility, which JACKSON used to communicate with his co-conspirators and others in furtherance of the conspiracy.

      e.    From in or around September 2018 to in or around November 2018, law enforcement intercepted telephone calls and text messages over the GILLENS 6542 Facility, which GILLENS used to communicate with his co-conspirators and others in furtherance of the conspiracy.

      f.    From in or around October 2018 to in or around November 2018, law enforcement intercepted telephone calls and text messages over the JACKSON 8537 Facility, which JACKSON used to communicate with his co-conspirators and others in furtherance of the conspiracy.

33.    The telephone calls and text messages intercepted over these telephone facilities further revealed the scope and details of the conspiracy's unlawful drug-trafficking activities, including the identities of several of its narcotics suppliers and other co-conspirators. Summarized below are some of the communications that law enforcement intercepted by, between, and amongst the co-conspirators and others in furtherance of the conspiracy.[5]

### JACKSON AND GILLENS

34.    During the investigation, law enforcement intercepted numerous communications over the JACKSON Facilities and the GILLENS 6542 Facility between JACKSON and GILLENS that were in furtherance of the drug-

---

[5] Unless noted otherwise, all communications described in this complaint involving GILLENS occurred over the GILLENS 6542 Facility, and all communications involving JACKSON (1) between on or about July 19, 2018 and on or about August 27, 2018 occurred over the JACKSON 4655 Facility; (2) between on or about August 27, 2018 and on or about September 24, 2018 occurred over the JACKSON 8569 Facility; and (3) between on or about September 24, 2018 and on or about November 12, 2018 occurred over the JACKSON 8537 Facility.

trafficking conspiracy. These communications revealed, among other things, that GILLENS supplied significant quantities of heroin and cocaine to JACKSON on a regular basis, and that JACKSON re-distributed those supplies of heroin to others in and around the Bayshore area and elsewhere. During and in furtherance of the conspiracy, GILLENS agreed to supply JACKSON with well more than 100 grams of heroin and 500 grams of cocaine.

35.    The communications intercepted over the JACKSON Facilities also revealed that, in furtherance of the conspiracy, JACKSON agreed to supply, and did supply, other co-conspirators, various dealers, sub-dealers, and end users with the supplies of heroin and cocaine that he obtained. The individuals to whom JACKSON supplied heroin and/or cocaine include, but are not limited to, co-conspirators CORDOBA, ALFANO, MCHUGH, SCARANGELLO, NAGY, DUBE, HOLIDAY, D. JACKSON, WILLIAMS, HALL, and others.

36.    Summarized in the paragraphs below are communications intercepted over the JACKSON Facilities and the GILLENS 6542 Facility demonstrating some of JACKSON's and GILLENS's acts in furtherance of the conspiracy. Additional communications intercepted over the JACKSON Facilities demonstrating other co-conspirators' roles in the conspiracy are summarized elsewhere in this complaint.

37.    On or about July 20, 2018, an individual later determined to be GILLENS called JACKSON. JACKSON said, "I'm around, so just tell me what time you're gonna come, but whatever. I'm around." GILLENS replied, "I'll probably head out in a couple minutes, then I'll come back and work on my truck. I'll call you when I start moving."

38.    Beginning later that morning, JACKSON and GILLENS exchanged the following text messages, among others:

| Sender | Recipient | Message |
|---------|-----------|---------|
| GILLENS | JACKSON | Butter n new one new play |
| JACKSON | GILLENS | Ok |
| JACKSON | GILLENS | Give me all 3 |
| GILLENS | JACKSON | P.  15 min away |
| JACKSON | GILLENS | Ok give me 20 |

39.    Based on the context and the investigation, I believe GILLENS informed JACKSON which stamps of heroin GILLENS was offering, including "BUTTER," which law enforcement had previously obtained in multiple controlled purchases from CORDOBA and ALFANO, and JACKSON asked GILLENS to deliver all three stamps of heroin GILLENS was offering.

40.   JACKSON and GILLENS exchanged additional text messages about their timing to reach the meeting location.  GILLENS again called JACKSON, who asked, "You at the door?"  GILLENS responded, "I'm at, yes, sir."  JACKSON replied, "All right."  Several minutes later, JACKSON texted GILLENS, "How many did u just give me again."  GILLENS responded, "55" (likely, bricks of heroin).  JACKSON replied, "Ok."

41.   On July 29, 2018, JACKSON texted GILLENS, "I will see u on Wednesday had death in the family I have things to take care of ok . Need 500 and the usual see u Wednesday."  JACKSON likely requested 500 grams of cocaine and his "usual" order of heroin.

42.   On July 30, 2018, JACKSON and GILLENS exchanged the following text messages, among others:

| Sender | Recipient | Message |
| --- | --- | --- |
| JACKSON | GILLENS | Blue cheese / two thumbs up / Pokémon and hulk any of them for Wednesday and 500 see u Wednesday |
| JACKSON | GILLENS | And Holy Ghost |
| GILLENS | JACKSON | I'll do what I can |
| JACKSON | GILLENS | Ok thank u |

43.   Based on the context and the investigation, I believe JACKSON ordered several stamps of heroin from GILLENS and confirmed his order of 500 grams of cocaine, then ordered an additional stamp of heroin ("Holy Ghost").

44.   On August 1, 2018, at approximately 2:14 p.m., law enforcement observed, via both surveillance and pole camera, JACKSON on State Street in Perth Amboy, New Jersey, talking on a cellular phone and wearing a backpack.  Law enforcement then observed JACKSON enter the State Street Address.  Minutes later, JACKSON texted GILLENS, "In town."  A few seconds later, GILLENS responded, "I'm here."  At approximately 2:25 p.m., law enforcement observed a black male later identified as GILLENS arrive at the State Street Address in a black Chevrolet Tahoe (the "Tahoe"), which is registered to GILLENS at an address in Allentown, Pennsylvania.  GILLENS entered the State Street Address carrying a large bag.  At approximately 2:37 p.m., GILLENS departed the State Street Address in the Tahoe.

45.   At approximately 3:10 p.m., the Tahoe arrived at Van Ness Ct. in Maplewood, New Jersey.  GILLENS exited the Tahoe and entered an address on that street associated with GILLENS in open source records (the "Maplewood Address"), carrying a bag.

46.   Based on communications intercepted over the GILLENS 6542 Facility and the JACKSON Facilities, surveillance, and other evidence,

16

JACKSON and GILLENS met multiple times per month from August 2018 through November 2018 for GILLENS to distribute narcotics—both heroin and cocaine—to JACKSON for further distribution.

47. For instance, on October 17, 2018, law enforcement conducting surveillance observed JACKSON and GILLENS met at the State Street Address, after having arranged the meeting over the JACKSON 8537 Facility and the GILLENS 6542 Facility. After GILLENS departed the State Street Address, GILLENS and JACKSON exchanged the following text messages:

| Sender | Recipient | Message |
|--------|-----------|---------|
| GILLENS | JACKSON | How many was last go |
| JACKSON | GILLENS | 53 |
| GILLENS | JACKSON | Do u remember how much u just have cause it seems off |
| JACKSON | GILLENS | U gave me 53 last time and I just gave u 8480 right and u just gave me 50 today |

48. Based on the context and the investigation, I believe JACKSON stated that GILLENS had given JACKSON 53 bricks of heroin the previous time they had met (October 8, 2018), for which JACKSON had just paid GILLENS $8,480, or $160 per brick. JACKSON then likely stated that GILLENS had just delivered 50 bricks of heroin to JACKSON on October 17.

49. JACKSON frequently ordered particular stamps of heroin from GILLENS. For instance, on October 29, 2018, JACKSON texted GILLENS, "Need to see u Wednesday. Hulk / Batman / Thug life / and a new name if u have." JACKSON likely stated that he wanted to purchase heroin on Wednesday, October 31, and wanted the "Hulk," "Batman," and "Thug Life" stamps, as well as a new stamp of heroin if GILLENS had one. Based on communications intercepted over the GILLENS 6542 Facility and the JACKSON 8537 Facility, surveillance, and other evidence, GILLENS and JACKSON met on October 31, 2018 at the State Street Address.

### *MEALING*

50. The investigation has revealed that MEALING conspires with JACKSON to engage in narcotics trafficking. JACKSON uses numerous vehicles—often switching vehicles over the course of a single day—to conduct narcotics transactions. Nearly all of these vehicle are registered to MEALING. As noted above, the utilities for the State Street Address appear to be in MEALING's name. MEALING also participates directly in narcotics transactions, as discussed below and in paragraphs 21 through 26 above regarding the controlled purchase from ALFANO on or about March 23, 2018.

17

51.     Additionally, one of MEALING's roles in the conspiracy is to conduct counter surveillance or act as a look-out.  For instance, in or around July 2018, while law enforcement was intercepting ALFANO's communications but not yet JACKSON's, a relative of ALFANO's ("CC-1") conducted a narcotics transaction with JACKSON on ALFANO's behalf, based on communications intercepted over the ALFANO 0744 Facility and surveillance.  On that date, law enforcement observed JACKSON and MEALING meeting in the parking lot of a fast food restaurant (the "Fast Food Restaurant") in Perth Amboy.  At approximately 3:00 p.m., law enforcement observed JACKSON walking around in the parking lot on the phone, while MEALING remained with her vehicle.  Then both JACKSON and MEALING were observed walking around the parking lot.  At approximately 3:30 p.m., CC-1 was observed traveling north on Route 35 in Perth Amboy past where JACKSON and MEALING were.  Toll records reveal a phone call between JACKSON and CC-1 at approximately 3:34 p.m.  Law enforcement then observed JACKSON and MEALING both walking around the Fast Food Restaurant's parking lot, looking around, while JACKSON was on his phone, at approximately 3:50 p.m.  At approximately 4:10 p.m., CC-1 was observed traveling Route 35 south and then pulling into the Fast Food Restaurant's lot.  JACKSON walked up to CC-1 and conducted a transaction.

52.     Based on my training and experience and on the investigation, I believe that MEALING and JACKSON were conducting counter surveillance of the parking lot—attempting to ensure that no law enforcement officers were surveilling the location—before CC-1 arrived to conduct a narcotics transaction.

53.     On or about November 5, 2018, MEALING (using the JACKSON 8537 Facility) called DUBE after DUBE had purchased narcotics from JACKSON and stated, "This is his wife," and asked "was everything okay with you?"  DUBE responded, "Yeah, why?"  MEALING responded, "He felt a little funny with something, so we wanted to make sure, nothing approached you or nothing was wrong, right?"  DUBE responded, "No, nothing at all."  MEALING continued, "And you didn't feel like anybody was behind you or anything, right?"  DUBE responded, "No, I'm at home and everything.  I made sure, I watch out for all that."  MEALING responded, "Okay, all right, just double checkin', be aware."

54.     On or about November 7, 2018, JACKSON texted DUBE, "Keep an eye out for a black Jeep Cherokee that is the police in that truck so keep an eye out ok."  DUBE responded, "I was wondering what was going on."  JACKSON replied, "Why have u seen it[?]"  DUBE answered, "No just when ur wife called I was wondering."  JACKSON responded, "O. Ok. Make so u check when u. Pick him up too ok it has Tinted windows also white Gu[y] driving with sunglasses."

55.     Based on my training and experience and on the investigation, I believe MEALING contacted DUBE to confirm that DUBE had not been followed

18

after purchasing narcotics from JACKSON.  JACKSON and DUBE later texted regarding a suspected law enforcement vehicle, and DUBE referenced her conversation with MEALING.

56.    On or about November 12, 2018, JACKSON (using the JACKSON 8537 Facility) arranged to sell narcotics to another co-conspirator ("CC-2"). Law enforcement observed JACKSON and CC-2 meeting at a location in or around Cliffwood at approximately 3:12 p.m.  At approximately 3:40 p.m., MEALING arrived at the location in Cliffwood driving the white Toyota minivan that JACKSON has frequently driven while conducting narcotics transactions. JACKSON spoke with MEALING while MEALING sat in the car.  At approximately 4:18 p.m., JACKSON (using the JACKSON 8537 Facility) spoke with CC-2 and discussed what they believed to be law enforcement surveillance of CC-2's location.

57.    At approximately 4:45 p.m., law enforcement observed JACKSON and MEALING, in separate cars, pull into a parking lot in or around Woodbridge.  (In an effort to avoid detection, law enforcement did not maintain continuous surveillance of JACKSON and MEALING.)  JACKSON parked his vehicle, a Honda, and got into the white Toyota van with MEALING.  At approximately 6:00 p.m., law enforcement observed MEALING arrive at a grocery store in Woodbridge (the "Grocery Store") and enter the Grocery Store. Based on communications with DUBE and CORDOBA intercepted over the JACKSON 8537 Facility, JACKSON was obtaining new phones (with new phone numbers) for himself, DUBE, and CORDOBA around that time.  JACKSON also told both DUBE and CORDOBA to meet him at the Grocery Store to purchase narcotics from him.

58.    At approximately 6:45 p.m., MEALING exited the Grocery Store.  At approximately 7:25 p.m., JACKSON arrived at the Grocery Store driving a Kia, which motor vehicle records reveal to be a rental car.  JACKSON exited the Kia and entered the back seat of the white Toyota minivan with MEALING. JACKSON exited the van with a black bag and thereafter met with CORDOBA, who had arrived at the Grocery Store earlier.  JACKSON engaged in a hand to hand transaction with CORDOBA and then got into CORDOBA's vehicle.

59.    At approximately 7:33 p.m., JACKSON entered the Kia, while MEALING acted as a look-out in the parking lot.  JACKSON exited the parking lot, and MEALING followed in the Toyota minivan.  JACKSON and MEALING proceeded to a residence and then to the parking lot in Woodbridge where JACKSON had parked the Honda earlier.  JACKSON parked the Kia and got into the Honda.  MEALING followed JACKSON in the white Toyota minivan as the two proceeded to get gas and then to return to their home in Effort, Pennsylvania.

19

60.    MEALING also directly participates in narcotics transactions.  For instance, on or about July 25, 2018, a co-conspirator ("CC-3") who purchases narcotics from JACKSON texted the JACKSON 4655 Facility, "10 pc" (ordering a quantity of narcotics).  Later that day, a woman (using the JACKSON 4655 Facility) called CC-3 and said, "I'll be there in 15 minutes.  Just go to [a particular store]."  Based on the woman's voice and the fact that she was using the JACKSON 4655 Facility, which the investigation has revealed JACKSON used almost exclusively for narcotics transactions during the time period he used that cell phone, I believe the woman who told CC-3 where to meet was MEALING.  Approximately 25 minutes later, JACKSON (using the JACKSON 4655 Facility) spoke with CC-3 to tell him where specifically to meet.  At around the same time, law enforcement observed a white minivan in the parking lot of the store MEALING had referenced.  The white minivan is registered to MEALING, and JACKSON had been operating it earlier that day while selling narcotics to others.

61.    On or about August 20, 2018, JACKSON arranged over the JACKSON 4655 Facility to sell HOLIDAY and MCHUGH narcotics.  Thereafter, JACKSON arrived at a location in Perth Amboy.  MEALING exited JACKSON's vehicle and entered HOLIDAY's vehicle, while JACKSON proceeded on a short distance to meet with MCHUGH.  MEALING exited HOLIDAY's vehicle after a few seconds.

62.    Additionally, on or about October 19, 2018, MEALING was in the passenger seat of JACKSON's vehicle while he engaged in narcotics transactions with NAGY, DUBE, and HOLIDAY.

### GETHERS AND ROGERS

63.    The investigation has revealed that GETHERS and ROGERS regularly purchase large quantities of heroin and cocaine from GILLENS for further distribution.  ROGERS and GETHERS are in a romantic relationship and live together at a residence in Perth Amboy.  GETHERS and/or ROGERS use the ROGERS 9244 Facility, which is registered to ROGERS, to conduct narcotics transactions with GILLENS.  Most of the intercepted communications between the ROGERS 9244 Facility and the GILLENS 9542 Facility have been text messages.  Of the telephone conversations intercepted, the user of the ROGERS 9244 Facility has always been male, and law enforcement familiar with GETHERS has identified the voice as GETHERS.  Of the apparent narcotics transactions with GILLENS that law enforcement has observed, ROGERS has always driven, with GETHERS in the passenger seat.

64.    For instance, on October 8, 2018, GILLENS exchanged the following text messages with the ROGERS 9244 Facility, likely GETHERS, among others:

| Sender | Recipient | Message |
|--------|-----------|---------|
| GILLENS | GETHERS | What time good for u |
| GETHERS | GILLENS | ASAP |
| GILLENS | GETHERS | Ok give me a hr |
| GETHERS | GILLENS | Ok |
| GILLENS | GETHERS | Rolling |
| GILLENS | GETHERS | In town |
| GILLENS | GETHERS | 4 min from spot |
| GETHERS | GILLENS | I'm getting some things to eat |
| GILLENS | GETHERS | Here |

65.    In fact, law enforcement observed GILLENS arriving back at the Maplewood Address in mid-afternoon, after having met with JACKSON earlier that afternoon in Perth Amboy, departing again shortly thereafter, and then arriving at a restaurant (the "Restaurant") in Perth Amboy. Law enforcement observed ROGERS and a black male later identified as GETHERS depart their residence in Perth Amboy, operating a silver Nissan. A few minutes later, ROGERS parked near the Restaurant, and GETHERS exited the vehicle and entered the Restaurant. Soon thereafter, GETHERS exited the back of the Restaurant and entered GILLENS's vehicle. GILLENS exited the parking lot and parked near ROGERS. GETHERS exited GILLENS's vehicle and entered ROGERS's vehicle. Both vehicles departed, and ROGERS and GETHERS returned to their residence.

66.    Law enforcement thereafter observed ROGERS and GETHERS depart their residence and GETHERS conduct multiple hand-to-hand suspected narcotics transactions on the afternoon of October 8, 2018.

67.    On the evening of October 10, 2018, the ROGERS 9244 Facility texted GILLENS, "Thug and gorilla tmr." GETHERS or ROGERS likely requested to purchase heroin with the "thug" and "gorilla" stamps from GILLENS the following day. The following morning, October 11, 2018, GILLENS and the ROGERS 9244 Facility exchanged multiple text messages and one telephone call, mostly to arrange when to meet. In addition, the holder of the ROGERS 9244 Facility agreed to purchase the "cheese" stamp of heroin from GILLENS as well as the stamps mentioned the night before.

68.    In fact, that afternoon, law enforcement observed GILLENS arrive at the back of the Restaurant. At approximately the same time, law enforcement observed ROGERS and GETHERS exit their residence in Perth Amboy, enter their vehicle, and depart. Law enforcement then observed ROGERS park close to the Restaurant. GETHERS exited the vehicle and entered the Restaurant. Soon thereafter, GETHERS exited the back of the Restaurant, holding a plastic bag, and entered GILLENS's car. Soon thereafter, GILLENS's vehicle exited the lot and, approximately two minutes later, parked near where ROGERS was parked. GETHERS exited GILLENS's vehicle and

21

entered ROGERS's vehicle. Both vehicles departed. Minutes later, ROGERS and GETHERS arrived back at their residence and entered the residence, with GETHERS carrying a plastic bag.

69.     GILLENS, GETHERS, and ROGERS engaged in a similar pattern on at least October 19, 2018, October 27, 2018, and November 9, 2018, with GILLENS once again parking in the Restaurant's lot, ROGERS driving GETHERS to a location near the Restaurant, GETHERS entering the Restaurant and then GILLENS's vehicle, GILLENS driving GETHERS to ROGERS's vehicle, and GETHERS exiting GILLENS's vehicle and entering ROGERS's.

70.     For instance, on October 26, 2018, GILLENS exchanged text messages with the ROGERS 9244 Facility, arranging to meet the following day. GILLENS asked, "Both or reg?"  GILLENS likely asked GETHERS or ROGERS whether they wanted just heroin (their regular order) or both cocaine and heroin.  The ROGERS 9244 Facility responded, "Reg," meaning that they only wanted to purchase heroin that time. On October 27, 2018, the ROGERS 9244 Facility texted GILLENS, "Make it both," telling GILLENS they wanted to purchase cocaine, as well as heroin, after all, and GILLENS responded, "Ok."

71.     On November 15, 2018, the ROGERS 9244 Facility texted GILLENS, "Gorilla, cheese tmr," likely ordering heroin with the "Gorilla" and "Cheese" stamps to be purchased the following day.

72.     On November 16, 2018, GILLENS exchanged texts and phone calls with the ROGERS 9244 Facility regarding the time that the defendants would meet. At approximately 7:13 p.m., GILLENS texted, "10 min" and "Away," meaning GILLENS was 10 minutes from the defendants' usual meeting location.  At approximately 7:22 p.m., GILLENS texted, "Let me know when your there," and the ROGERS 9244 Facility responded, "Inside," to which GILLENS responded, "2 min," meaning GILLENS was two minutes away from the meeting location.

73.     In fact, law enforcement observed the Subjects arrive at or near the Restaurant and engage in their usual practice when meeting to conduct narcotics transactions, including GETHERS entering GILLENS's vehicle.

74.     A short time after GETHERS exited GILLENS's car and entered the car ROGERS was driving, law enforcement conducted a vehicle stop of ROGERS's car.  Law enforcement observed what was later determined to be approximately 60 bricks of apparent heroin in plain view in the vehicle. GETHERS provided consent to search his and ROGERS's residence, where law enforcement found approximately 18 additional bricks of apparent heroin, as well as quantities of apparent crack cocaine and apparent powder cocaine, and

United States currency. GETHERS and ROGERS were detained and released on a local summons.

***CORDOBA***

75. In addition to the controlled purchases described above, the investigation has revealed that CORDOBA frequently purchases narcotics from JACKSON for further distribution.

76. For instance, on July 20, 2018, JACKSON and CORDOBA communicated to arrange to meet in Woodbridge, New Jersey for CORDOBA to purchase narcotics from JACKSON. Shortly after 6:00 p.m., CORDOBA called JACKSON and informed him, "I have 1120 with me right now. If I wait, like, 15, 20 minutes, I can get the rest. You want me to just [come soon?], do that?" JACKSON responded, "Listen, long as you're here by 6:30." CORDOBA replied, "All right, I'm gonna wait. . . . I'll call you if this is longer." JACKSON responded, "Yeah, cuz I'm not saying till 7, so." CORDOBA stated she would rather "have everything," but "if you need to go, then I can go. I'll have it in like you know a half hour, 40 minutes." JACKSON told CORDOBA, "I'm not going to wait for 40 minutes," adding that CORDOBA needed to be there at 6:30, not call him at 6:30 to say she was on her way. CORDOBA responded, "All right, let me see how far they are. I might just have to come to see you at 6:30." Based on my training and experience and the investigation, CORDOBA did not have enough money at that time to pay JACKSON what she owed or would owe him. CORDOBA indicated that she could likely get the money from her own customers, but she might not have time to pick up the cash from her customers and still be able to meet JACKSON in Woodbridge by 6:30 p.m.

77. CORDOBA and JACKSON continued to exchange frequent texts on July 20, 2018, for instance:

| Sender | Recipient | Text |
|--------|-----------|------|
| JACKSON | CORDOBA | U said u got how much right now |
| CORDOBA | JACKSON | Yup 1120 |
| JACKSON | CORDOBA | U owe me 1400 what the fuck |
| CORDOBA | JACKSON | Inkni if i waites id gave over just therr not even on pway |
| JACKSON | CORDOBA | U better come here with $ 1400 or u not getting anything today u got to 6:45 tops |
| CORDOBA | JACKSON | Ok |
| CORDOBA | JACKSON | Il wait |
| JACKSON | CORDOBA | Wait for what |
| JACKSON | CORDOBA | I need that money by 6:45 |
| CORDOBA | JACKSON | For them n hav it all |
| JACKSON | CORDOBA | So u will be here by 6:45 |
| CORDOBA | JACKSON | Im close just waiting 4 them |

23

| Sender | Recipient | Text |
|--------|-----------|------|
| CORDOBA | JACKSON | Should have extra for hz & 3 grls il make sure tho text when on way |
| JACKSON | CORDOBA | Ok be careful |

78.     Based on the context and the investigation, I believe CORDOBA was weighing whether to wait for her own customers to arrive with the additional money she owed JACKSON before she left to meet JACKSON.  When CORDOBA informed JACKSON she had $1,120 on her, he likely objected, stating that CORDOBA owed him $1,400, so he would not sell her any further narcotics unless she had $1,400 when she met him.  CORDOBA thereafter likely told JACKSON she was waiting for her own customers to bring her the money she owed JACKSON and that she should have extra money for a brick ("hz") of heroin and three grams of cocaine ("grls").

79.     At approximately 6:21 p.m. and 6:22 p.m., CORDOBA spoke with JACKSON and told him she had run out of gas.  JACKSON stated, "every week it's something different with you."  Law enforcement observed JACKSON exit his location in Woodbridge at approximately 6:24 p.m. and return to a nearby location at approximately 7:06 p.m.  At approximately 7:20 p.m., JACKSON texted CORDOBA, "U know u owe me Big time right."  CORDOBA responded, "I lovr u i was literally texting u," and, "Lol ty Soo much."  At approximately 7:54 p.m., CORDOBA texted JACKSON, "Ty u too .. N ty soo much for real."  JACKSON responded by text, "Np" (no problem).

80.     On July 23, 2018, after JACKSON and CORDOBA met to conduct a narcotics transaction, JACKSON texted CORDOBA, "U home," to which CORDOBA replied, "Yes just bout 2 text u was talking to Kelly," likely meaning that CORDOBA was speaking with her attorney, whose first name is Kelly. JACKSON responded, "Ok cool."  On July 30, 2018, CORDOBA texted JACKSON that she "was at pti," likely meaning that CORDOBA was at Pretrial Intervention ("PTI") for a previous drug charge.  On August 1, 2018, CORDOBA texted JACKSON, "What rime [time] u round i had court in town got dismissed love kelly!", meaning CORDOBA's court case was dismissed.  A few seconds later, CORDOBA ordered particular stamps of heroin from JACKSON.

81.     On August 8, 2018, JACKSON and CORDOBA communicated to arrange for CORDOBA to purchase narcotics from JACKSON, for instance:

| Sender | Recipient | Text |
|--------|-----------|------|
| CORDOBA | JACKSON | Chz & butr like to eat |
| JACKSON | CORDOBA | U got it all right |
| JACKSON | CORDOBA | $1370 |
| JACKSON | CORDOBA | ?? |
| CORDOBA | JACKSON | 1310 |
| CORDOBA | JACKSON | I cant go to Asbury to get more loot |

| Sender | Recipient | Text |
|--------|-----------|------|
| JACKSON | CORDOBA | Why r u always short that's not how this works |
| CORDOBA | JACKSON | O have exact to get exact i can't go to Asbury thats where they are well talk jn few i always sauare |
| CORDOBA | JACKSON | Getting off in few min where go |
| JACKSON | CORDOBA | By the water |
| CORDOBA | JACKSON | Kk |
| JACKSON | CORDOBA | Are you saying you are going to pay me what you owe me now and you have money to buy extra now |
| JACKSON | CORDOBA | ? |
| CORDOBA | JACKSON | I have pretty muxh what i owe |
| CORDOBA | JACKSON | Id have extra if i drove to Asbury but i don't got time 4 that n who kniws when id be back |

82.     Based on the context and the investigation, I believe CORDOBA ordered particular stamps of heroin from JACKSON, who then stated that CORDOBA owed him $1,370 from previous transactions.  CORDOBA responded that she owed $1,310 and stated that she could not get to her customers in Asbury Park to get more money to pay JACKSON.

83.     A few minutes after the defendants exchanged the last of these text messages, law enforcement observed JACKSON and CORDOBA meet at the Perth Amboy waterfront.  Afterward, CORDOBA texted JACKSON: "Btw 570 / 70 plus 60 plus 2 hz.."  CORDOBA likely told JACKSON that she now owed him $570, which included $70 for one thing, $60 for another, plus 2 bricks of heroin, which the investigation has revealed JACKSON typically sells for $220 per brick ($220 x 2 + $60 + $70 = $570).  JACKSON responded, "Ok."

84.     On September 12, 2018, JACKSON and CORDOBA arranged for JACKSON to sell narcotics to CORDOBA.  JACKSON informed CORDOBA that he would be away for several days.  After they met, CORDOBA texted JACKSON, "Pullin up 2 casa be safe on ur trip ty chat when back n dont forget bout my pti!"  Based on the context, CORDOBA reminded JACKSON to help with her Pretrial Intervention.  JACKSON responded, "Ok I got u."

85.     On September 20, 2018, JACKSON and CORDOBA arranged for JACKSON to sell narcotics to CORDOBA.  After they met, the defendants exchanged the following text messages, among others:

| Sender | Recipient | Text |
|--------|-----------|------|
| CORDOBA | JACKSON | Bout 2 b home b safe n can we plz fig out pti this wk me scurred |
| JACKSON | CORDOBA | Ok I got u I will pay it off put u have to give me a little ok |

| Sender | Recipient | Text |
| --- | --- | --- |
| CORDOBA | JACKSON | This is my life! Ud cry if i went away forever! But for real its been freaking me out holler soon home gotta shower be safe |
| JACKSON | CORDOBA | I got u don't worry |
| CORDOBA | JACKSON | Gotta talk 2 kells just want 2 be done asap cuz she said takes steps n i dont want to go to next apt. Well talk soon ty nitey nite |

86.     CORDOBA likely asked JACKSON to help with her PTI and possibly stated that she was scared.  JACKSON likely told CORDOBA he would pay off her PTI fine.  CORDOBA likely responded that she did not want to go to jail if her PTI was not completed and that she needed to talk to her lawyer about the next steps in her PTI process.

87.     On October 24, 2018, JACKSON and CORDOBA arranged for JACKSON to sell narcotics to CORDOBA.  For instance, CORDOBA texted, "Def need least 4hz 5 hz or more.. Squaring n have extra."  CORDOBA likely ordered four or five bricks of heroin and likely stated she would have extra money beyond that.  JACKSON texted, "And how much extra money do you have so I know what to give you," to which CORDOBA later responded, "Should b 285." After engaging in the narcotics transaction, which law enforcement observed, JACKSON called CORDOBA and told her to make sure she sent a text when she got home.  CORDOBA texted JACKSON, asking, "U have anything else besides batmn dvd? Lik 2pac cd or gorilla."  CORDOBA likely asked JACKSON whether he had heroin with stamps other than "Batman," such as "2pac" or "Gorilla."  CORDOBA asked what she owed, to which JACKSON responded, "1450."  CORDOBA also later texted JACKSON that she had arrived home.

88.     On November 2, 2018, JACKSON and CORDOBA arranged for JACKSON to sell narcotics to CORDOBA.  For instance, CORDOBA texted, "Hey coming down let u kno what eating when hear," meaning CORDOBA would tell JACKSON what her narcotics order was once she heard from her customers, to which JACKSON responded, "Ok in cliffwood."  CORDOBA then texted, "4 hz and like 10 gaka," meaning CORDOBA ordered four bricks of heroin and ten grams of cocaine.  The defendants texted regarding where and when to meet, and law enforcement observed them meeting at the agreed location.

89.     On November 12, 2018, JACKSON called both DUBE and CORDOBA and told each of them that he was about to get a new phone and offered each that he would get a new phone for them as well, with new numbers.

90.     For instance, at approximately 5:37 p.m., JACKSON called CORDOBA and told her he had texted her the location where she should go to meet him.  In fact, JACKSON had texted CORDOBA a link to the Google search

results for a Grocery Store in Woodbridge. JACKSON told CORDOBA that if she could not be there in 30 minutes, "let me know right now because I'm about to switch my phone and I'm gettin' you a phone, too, so." CORDOBA responded, "Yay!" JACKSON said, "Let's clarify where to go and do all that now, then we won't have to be goin' back and forth." CORDOBA gave JACKSON her order, "I need 2 and at least 5 girls," meaning two bricks of heroin and five grams of cocaine. CORDOBA later changed this order to three or four bricks of heroin in a different communication. Before getting off the phone, JACKSON confirmed that CORDOBA knew where to go. CORDOBA said, "It's not the same one we always go to, it's a different one?" JACKSON responded, "Exactly." At approximately 6:03 p.m., JACKSON texted CORDOBA, "Getting the phones now."

**ALFANO**

91.     In addition to the controlled purchases described above, ALFANO purchased narcotics from JACKSON and others during the period law enforcement intercepted ALFANO's communications.

92.     For instance, on June 20, 2018, ALFANO texted JACKSON (using the JACKSON 4447 Facility), "2 buns and 3 grams," meaning ALFANO ordered two bundles of heroin and three grams of cocaine from JACKSON, and JACKSON texted ALFANO to go to a location in or around the Cliffwood/Keyport area. The defendants exchanged text messages regarding the timing of their meeting. Finally, at approximately 5:34 p.m., JACKSON texted, "How long," and ALFANO responded, "Two minutes I'm in the truck." In fact, at approximately 5:36 p.m., law enforcement observed ALFANO driving a black dump truck and meeting with JACKSON at a location in or around the Cliffwood/Keyport area.

93.     At approximately 5:32 p.m., another individual ("Individual-1") texted ALFANO, "Did you get my shit," to which ALFANO responded, "Yes" ALFANO likely confirmed to his customer that he had obtained the narcotics from his supplier, JACKSON. ALFANO's customer instructed ALFANO where to leave the narcotics for him/her, and ALFANO agreed.

94.     On the night of June 23, 2018, ALFANO was arrested on outstanding warrants for child support and driving with a suspended license. ALFANO was in custody until approximately the afternoon of June 25, 2018. That same afternoon, at approximately 5:50 p.m., JACKSON texted ALFANO, "Yea." ALFANO responded, "Can I see you," and JACKSON replied, "Do I guess u not going to tell me u got locked up and just got out huh" and "Don't u know the street talk."

95.     A few minutes later, ALFANO called JACKSON and told him, "it's child support." JACKSON stated that he needed to hear from ALFANO what

happened and should not be hearing from other people. ALFANO said, "you ain't worried with me now are [or were] you?" JACKSON responded, "Should I be?" ALFANO said, "I would hope not." JACKSON said, "If I was worried about you, I wouldn't have answered your texts or your calls. . . . That's a good indication, right?" and "I think you should know by now that I wouldn't have picked up [the] call," meaning that JACKSON would not have answered the texts or calls from ALFANO if JACKSON believed ALFANO was cooperating with law enforcement. ALFANO said, "I hope would you know by now I would never fuckin' mention anything about anybody else," meaning ALFANO would never make a statement to law enforcement about someone other than himself. JACKSON told ALFANO that he tells "people that I deal with if you ever get into some shit, the best thing to do . . . at the end of the day you don't say nothin'." JACKSON advised ALFANO that upon being arrested, if a person that works for JACKSON is unable to be released, they should have someone "get in contact with me and I got somebody for you, you understand?" ALFANO stated he would have had a family member call JACKSON, but his PIN number wasn't activated at the jail so he could not make any calls when he got into custody in the middle of the night.

96.    JACKSON asked, "what you tryin' to do," meaning what narcotics ALFANO wanted to purchase from JACKSON. ALFANO responded that he was broke and only had enough for "one bun," meaning one bundle of heroin. Later, JACKSON advised ALFANO to go to a particular location in or around Old Bridge, New Jersey. Law enforcement later observed JACKSON and ALFANO meeting near that location.

97.    Over the days and weeks following ALFANO's June 23, 2018 arrest, JACKSON began to reduce, and then eliminate, his contact with ALFANO, out of apparent suspicion of ALFANO because of ALFANO's arrest as well as law enforcement surveillance that JACKSON identified.

98.    First, JACKSON would meet only with CC-1 to fulfill ALFANO's orders (which he did, for instance, on June 26, June 29, July 2, July 3, and July 6, 2018). Soon, JACKSON stopped meeting with CC-1 and others associated with ALFANO. Based on intercepted communications, JACKSON and other co-conspirators were concerned that ALFANO might be cooperating with law enforcement. For instance, on July 5, 2018, JACKSON (using the JACKSON 4655 Facility) spoke with ALFANO (using the ALFANO 0744 Facility) and told him, "two different people just called me about you almost literally back to back, like eight minutes apart, saying yo you know Danny got popped, don't fuck with him." ALFANO stated, "I ain't never ratted nobody on [sic], in my fuckin' life." JACKSON stated, "I get it, but you also gotta know how it looks." JACKSON said, "This is my whole thing. Somebody, now I'm not saying it's you, I'm not saying it's your [family member], I'm not saying it's none of the people in our circle, I'm not saying none of that, but somebody . . . [or somebody that one of their people met] got everything hot." JACKSON stated,

28

"Somebody had to say something or somebody had to get caught and had to say something to them for them to do what they're doing now. They [law enforcement] just don't do that out of a whim."

**MCHUGH**

99.    The investigation has revealed that MCHUGH frequently purchases narcotics from JACKSON for further distribution. MCHUGH typically orders 10 bricks of heroin at a time, and sometimes cocaine, from JACKSON.

100.    For instance, on July 27, 2018, JACKSON and MCHUGH (using the MCHUGH 5497 Facility) exchanged the following text messages, among others:

| Sender | Recipient | Text |
|--------|-----------|------|
| JACKSON | MCHUGH | Ready 40 min |
| JACKSON | MCHUGH | What do u need |
| MCHUGH | JACKSON | 10 count all pokey mon please thank you |
| JACKSON | MCHUGH | Ok |

101.    MCHUGH ordered 10 bricks of heroin with the "Pokemon Go" stamp, which law enforcement obtained during several controlled purchases from CORDOBA and ALFANO.

102.    JACKSON and MCHUGH communicated further regarding where and when to meet. That afternoon, law enforcement observed JACKSON arrive at a strip mall in Sayreville and meet and conduct a hand-to-hand transaction with MCHUGH.

103.    On August 6, 2018, MCHUGH texted JACKSON, "Need to see you afer work today 10 count 5 pokey and 5 cheese." Based on the context and the investigation, MCHUGH likely ordered 10 bricks of heroin from JACKSON, including 5 bricks with the "Pokemon Go" stamp and 5 bricks with the "cheese" stamp. That afternoon, law enforcement observed JACKSON and MCHUGH meeting at a location in Perth Amboy.

104.    On August 12, 2018, MCHUGH texted JACKSON, "What up putting in order for tom. I need 100 of the girl and also 50 of the girl plus 10 count of pokey. Thank you." Based on the context and the investigation, MCHUGH likely ordered 10 bricks of heroin and likely, based in part on later interaction, 150 grams of cocaine from JACKSON. JACKSON responded by text, "Ok just text me a time ok."

105.    In similar fashion, MCHUGH placed orders of 10 bricks of heroin—generally ordering a "10 count" and sometimes ordering particular stamps of

heroin—from JACKSON on or about August 17, August 22, September 13, September 18, September 22, October 19, October 22, and October 26, 2018.

106. On October 17, 2018, MCHUGH spoke with JACKSON and ordered "10 of the girl" (10 grams of cocaine) and stated that he would want his "regular 10 on Friday . . . to get me through the weekend." JACKSON responded, "Okay, no problem." MCHUGH stated that he was "waitin' on the other one, too. He should be any day now, so if he pops then it'll be a big [indecipherable; possibly 'one'] of the girl, too." Based on the context and the investigation, MCHUGH had a customer who was likely to want a large amount of cocaine in the near future. JACKSON said to give him "about 15 minutes. I'll be there." MCHUGH apologized again, and JACKSON said, "No problem."

107. Later that afternoon, JACKSON called MCHUGH, and MCHUGH advised that he was on his way and that he "had to get my son in the car, I'm sorry. Fuckin' forgot I had to take him out with me tonight; my wife's on her way to work." MCHUGH stated that he would be there in "3 or 4 minutes," and that "I'm boogying. I'm sorry, brother."

108. In fact, law enforcement observed MCHUGH and JACKSON meeting at a location in Perth Amboy where JACKSON has been observed conducting narcotics transactions in the past. While surveilling MCHUGH, law enforcement observed a child in his car. Law enforcement also observed MCHUGH engage in multiple hand-to-hand apparent narcotics transactions before and after meeting with JACKSON.

109. On October 31, 2018, MCHUGH texted JACKSON, "Can i see you today 100 of the girl plus 50 of the girl . Plus a 10 count of hulk and batman 5 and 5 thank you." Based on the context and the investigation, MCHUGH likely ordered 150 grams of cocaine and 10 bricks of heroin (5 bricks of the "Hulk" stamp plus 5 bricks of the "Batman" stamp). Jackson responded, "Ok cool just tell me a time." MCHUGH responded, "Around 4 pm." At approximately 3:56 p.m., MCHUGH texted, "Im ready," to which JACKSON responded, "Come to the house" and "Cliffwood." At approximately 4:26 p.m., JACKSON texted, "How long until u r here," and MCHUGH responded, "At light 1 min."

110. At approximately 4:28 p.m., law enforcement observed JACKSON and MCHUGH meet at a location in Cliffwood, New Jersey. Law enforcement thereafter observed MCHUGH meet with several different white males in close succession at locations in or around Old Bridge, Cliffwood, and Aberdeen, New Jersey. Law enforcement subsequently conducted a traffic stop of one of the individuals who had been observed meeting with MCHUGH and recovered a small bag of what appeared to be crack cocaine.

*SCARANGELLO*

111.   Based on law enforcement surveillance, SCARANGELLO met frequently with JACKSON during the period JACKSON's communications were intercepted, often arranging the meetings over one of the JACKSON Facilities, though communications between JACKSON and SCARANGELLO were often not intercepted on dates the two defendants were observed meeting.

112.   On August 3, 2018, JACKSON called SCARANGELLO on the SCARANGELLO 9959 Facility and advised him that SCARANGELLO had not given JACKSON enough money.  SCARANGELLO responded that he had given JACKSON $2,240, but JACKSON counted his money while he was on the phone with SCARANGELLO and responded that he had received only $1,240. SCARANGELLO said he would be right there.  Based on the context and the investigation, I believe that SCARANGELLO either bought more than $2,200 worth of narcotics on that date or owed that amount for one or more narcotics transactions.

113.   On August 13, 2018, SCARANGELLO called JACKSON, and JACKSON asked how far away SCARANGELLO was.  SCARANGELLO stated that he had just gotten on the Garden State Parkway.  JACKSON said to meet at a particular location and that SCARANGELLO had not texted him his order. SCARANGELLO stated that he would do so.  No text message with an order from SCARANGELLO was intercepted.  However, a short time later, law enforcement observed SCARANGELLO meet with JACKSON at a location in Old Bridge consistent with the instructions JACKSON had given SCARANGELLO.

114.   On August 24, 2018, SCARANGELLO texted JACKSON several times to ask whether JACKSON was around, for instance, "Hey u around in 30 to 40in."  Later that day, law enforcement observed JACKSON meet with SCARANGELLO at a location in Perth Amboy.

115.   On October 26, 2018, law enforcement observed JACKSON meet with SCARANGELLO.  Thereafter, law enforcement conducted a traffic stop of SCARANGELLO and observed in plain view glassine bags—which I know to be a common way to package individual doses of heroin—with the stamp "BATMAN."  Law enforcement recovered approximately 150 glassine bags (equal to approximately three bricks) of suspected heroin.  One brick's worth of bags were stamped "THUG LIFE" in blue ink, while two bricks' worth of bags were stamped "HULK" in green ink.  Law enforcement also recovered approximately 11 empty glassine bags, eight of which were stamped "BATMAN" in red ink and three of which bore no stamps.

***NAGY***

116.  NAGY frequently purchased narcotics from JACKSON during the period JACKSON's communications were intercepted.  According to a statement NAGY made to JACKSON, NAGY has been a customer of JACKSON for approximately seven years.

117.  On July 27, 2018, at approximately 11:08 a.m., NAGY texted JACKSON, "Hey i need a whole," meaning NAGY wanted to purchase a brick of heroin from JACKSON.  JACKSON texted back, "1:00."  At approximately 1:50 p.m. and 1:53 p.m., JACKSON spoke with NAGY and told him to "Walk down to the store . . . . The girl is there waiting for you, so she can bring you to me."  Several minutes earlier, JACKSON had texted DUBE, "Can you bring that person to Woodbridge for me I forgot to ask you when I seen you the boy that you picked up before," and she had agreed.

118.  In fact, at approximately 2:10 p.m., law enforcement observed DUBE drop off a white male (later identified as NAGY) at Jackson's vehicle at Woodbridge Mall.  NAGY entered Jackson's Accord, got out of the Accord a short time later, and then departed the area with DUBE.

119.  On August 1, 2018, NAGY texted JACKSON and requested, "2 wholes and another 7 gs of  girl," and reiterated several minutes later, "2 wholes an the 7 gs of girl."  Based on the context and the investigation, NAGY ordered two bricks of heroin and seven grams of cocaine.  NAGY then texted, "How  much all together," and JACKSON responded, "$790."  Based on the investigation, I believe JACKSON charged NAGY $220 per brick of heroin and $50 per gram of cocaine.

120.  On August 1, 2018, JACKSON also spoke with both NAGY and DUBE separately and chastised each about the fact that DUBE had given her phone number to NAGY while giving him a ride (on July 27, 2018, as discussed above) because NAGY had asked if DUBE had a source for Xanax and DUBE had said yes.  JACKSON emphasized that he had put NAGY and DUBE together only for a ride, and each one was his customer and they were not allowed to exchange numbers.  NAGY told JACKSON, "Mike, c'mon, man, I had this argument with you, bro.  I don't want to argue with you, dude, c'mon, I've been with you seven years, Mike.  C'mon, bro."  NAGY called JACKSON "Mike," which the investigation has revealed is a common nickname for JACKSON among his customers, and told JACKSON he did not want to fight and that he had been purchasing narcotics from JACKSON for seven years.

121.  In a separate call, JACKSON explained to DUBE that she should never give his customer her number, but that he would use her as his source if he sold Xanax to NAGY.  In fact, NAGY asked JACKSON for Xanax on August 6, 2018, and JACKSON immediately called DUBE, to find out if she had any.

Later that day, JACKSON and NAGY discussed an unknown vehicle parked across from NAGY's house, the planned location for the two defendants to meet. At one point, NAGY related to JACKSON, "I went up and I confronted 'em, I said, uh, hey, can I help you with somethin' and he was like, nah, we're just waitin' for somebody." NAGY said people were doing work at the house across from him. JACKSON said, "Aight, keep an eye on it cuz that shit is all tinted out, you know what I mean?" Later, JACKSON called NAGY for an update, and NAGY said, "they just fuckin' bounced." NAGY stated that his "next door neighbor, their kid is, like, uh, fuckin' parole or probation or something," so sometimes "5-0 rolls up to fuckin', uh, pick the kid up." JACKSON responded, "Okay, that's what I'm sayin', we don't need to be doing business in front of nobody like that. . . . We gonna start meetin' down the street on your street."

122. NAGY said he thought "they were the guys that did the fence," and JACKSON responded, "but we gotta be sure." NAGY said he understood and that his "neighbor sits in his car all day, so, and if he sees anything, it comes right to me. Trust me, you know damn well I'm looking out for you, brother. . . . I mean, you're my dude, bro, so whatever I can do, Imma help you out." JACKSON responded, "No doubt, no doubt, all right." Based on the context and the investigation, NAGY and JACKSON discussed whether the vehicle parked across the street from NAGY's residence might be law enforcement, and NAGY suggested that they might be construction workers or parole or probation officers. JACKSON stated that they should not conduct narcotics transactions in front of potential probation officers, so they should start meeting down the street instead of right near NAGY's residence.

123. In fact, the vehicle parked across the street from NAGY's house belonged to law enforcement officers conducting surveillance for the present investigation. When NAGY approached the vehicle, as he described to JACKSON, one of the officers conducting surveillance recognized NAGY as a person the officer had previously arrested.

124. On August 10, 2018, JACKSON and NAGY exchanged the following texts, among others:

| Sender | Recipient | Text |
|---|---|---|
| NAGY | JACKSON | Hey im getting my money together. Noe so im gonna tex u my order in likr 15 mins k |
| JACKSON | NAGY | Ok |
| NAGY | JACKSON | Need 3 wholes. And 3 and a half gs of girl 1 pice. Hoe much for everithyng |
| JACKSON | NAGY | $960 |
| NAGY | JACKSON | I payed$350 for 7last time |
| JACKSON | NAGY | Because u only get 3 it's 60 a g anything over 5 g is 55 a g |

| Sender | Recipient | Text |
|--------|-----------|------|
| JACKSON | NAGY | 960 is for everything |
| JACKSON | NAGY | The girl and boy |
| JACKSON | NAGY | U want 3 whole and 3 1/2 girl right |
| JACKSON | NAGY | $660 for the 3 whole and and $200 for the girl |
| JACKSON | NAGY | I took of 10 bucks |
| NAGY | JACKSON | So is $860right |
| JACKSON | NAGY | Yes |
| NAGY | JACKSON | Im 40 short so ill just take the 3wholes I , thought it was going to be cheaper |
| JACKSON | NAGY | Ok so u go 840 |
| NAGY | JACKSON | I ONLY HAVE 800 |
| JACKSON | NAGY | Ok so u get 3 whole and 2 and a half g |

125. Based on the context and the investigation, I believe NAGY ordered three bricks of heroin and 3 ½ grams of cocaine, then, after JACKSON told him the price, protested that he had paid only $50 per gram of cocaine in his last purchase. I believe JACKSON explained that he charged $55 per gram if NAGY ordered more than 5 grams at a time but $60 per gram if NAGY ordered 5 grams or fewer, and then confirmed the price was $660 for 3 bricks of heroin, or $220 per brick, and $200 for 3 ½ grams of cocaine, or $60 per gram minus $10. NAGY then told JACKSON he was $40 short of the price JACKSON quoted, so NAGY would purchase only the three bricks of heroin. JACKSON responded that NAGY could obtain three bricks of heroin and 2 ½ grams of cocaine for the $800 that NAGY had.

126. NAGY then called JACKSON and said, "I could just get the three wholes cuz, uh, that was for my friend." JACKSON told NAGY "if you buy 5 or better, then I lower the price. When you don't buy 5 or better, then it's 60 a gram. So because you saying that you only have 800, I'm giving you 2 ½, not 3." NAGY said he would take only 3 wholes then and "maybe Monday I talk to my boy and see if he wants it." JACKSON responded, "No problem." NAGY later called JACKSON and told him, "Yo, I'll take the 2 ½ for the 2." JACKSON said, "You better make up your mind, man." JACKSON expressed frustration that the person NAGY referred to as his "boy" had ordered seven in the past and now was ordering just 2 ½ (grams of cocaine). Later that afternoon, law enforcement observed JACKSON and NAGY meet down the street from NAGY's residence.

127. NAGY continued ordering narcotics from JACKSON on a regular basis, generally ordering between 1 and 3 "wholes" (bricks of heroin), and sometimes cocaine or, in one instance, marijuana. Several times, JACKSON instructed DUBE to pick NAGY up to bring him to JACKSON for the narcotics transactions.

128.   For instance, on October 24, 2018, NAGY texted JACKSON, "Yo i need two wholes," meaning two bricks of heroin.  JACKSON responded, "Ok 1:30."  At approximately 1:43 p.m., JACKSON informed NAGY that "She coming to To get you go to the store in five minutes."  Meanwhile, JACKSON told DUBE to pick up NAGY, for instance texting DUBE at approximately 1:40 p.m., "20. Mins food store. Pick him up."  Based on the context and the investigation, JACKSON directed DUBE to pick up NAGY, as he had done multiple times previously, and to bring NAGY to conduct his narcotics transaction with JACKSON.

129.   Later that afternoon, NAGY texted JACKSON, "Yo my dude how much can u give me a half ounce of girl."  Based on the context and investigation, NAGY asked JACKSON what the price would be for half an ounce (approximately 14.2 grams) of cocaine.  JACKSON responded, "700."  NAGY responded, "Ok i will let u know."

***DUBE***

130.   DUBE frequently purchases both heroin and cocaine from JACKSON.  As noted above, she has provided NAGY rides to purchase narcotics from JACKSON several times, all on days that DUBE also purchased narcotics from JACKSON.  DUBE frequently refers to needing to hear from her own customers before placing her order with JACKSON and has made more than one purchase from JACKSON in a single day a number of times during the time JACKSON's communications were intercepted.

131.   For instance, on September 24, 2018, DUBE informed JACKSON by telephone call that she would need to see him twice because of what her customers wanted.  At approximately 1:46 p.m., DUBE texted JACKSON, "Hey I need 4 n ½ Gs n 3 buns plus I got the 330…. just lyk [likely, "letting you know"] ahead of time. but I'll hit u in like hr."  Based on the context and the investigation, DUBE ordered 4 ½ grams of cocaine and 3 bundles of heroin, plus she had $330, which she likely owed JACKSON for previously obtained narcotics.  Approximately two minutes later, DUBE clarified, "That's just 1st go around… gonna have to see u after that too…"  JACKSON responded, "Ok."

132.   At approximately 2:25 p.m., JACKSON told DUBE he was ready for her and stated "u can pick up old boy for me to okay" (JACKSON asked DUBE to pick up NAGY and bring him to the purchase location).  JACKSON then relayed to NAGY when DUBE would pick him up.  DUBE texted JACKSON at approximately 3:02 p.m., "Coming over bridgr" (DUBE was crossing the bridge to Perth Amboy, where the defendants had agreed to meet), and, at approximately 3:15 p.m., "Here" (DUBE was at the agreed meeting location).

133.   In fact, at approximately 3:17 p.m., law enforcement observed JACKSON meet with DUBE at a location in Perth Amboy.  DUBE entered

35

JACKSON's vehicle, while NAGY was observed in the front passenger seat of DUBE's vehicle.

134. At approximately 4:50 p.m., DUBE texted JACKSON asking how late he was staying and stated that her customer "talking bout she not coming till 6." JACKSON responded, "Leaving at like 6:30." DUBE texted that she would try to get the money she needed to pay for her second order from JACKSON another way, and JACKSON texted that he would come meet DUBE closer to her location to save time. DUBE ordered "2gs n bun," meaning two grams of cocaine and one bundle of heroin. At approximately 5:19 p.m., JACKSON texted DUBE, "Meet me [at a location in or around Keyport/Cliffwood] in 3 mins." Approximately four minutes later, DUBE texted that she was behind a "slow ass gas truck," and approximately one minute after that texted JACKSON, "I'll be there in one minute."

135. On October 17, 2018, JACKSON texted DUBE at approximately 10:53 a.m., "Order," to which DUBE quickly replied, "3 and 3," likely meaning DUBE ordered three bundles of heroin and three grams of cocaine. At approximately 10:59 a.m., JACKSON instructed DUBE to "pick him [NAGY] up in 10 minutes meet me at the food store." At approximately 11:30 a.m., DUBE texted JACKSON, "Here," and JACKSON responded, "4 mins." In fact, at approximately 11:30 a.m., law enforcement observed DUBE arrive at the parking lot of a food store in Perth Amboy. At approximately 11:34 a.m., law enforcement observed JACKSON depart the State Street Address in Perth Amboy, and at approximately 11:38 a.m., law enforcement observed JACKSON enter the parking lot of the food store. DUBE entered JACKSON's vehicle, which circled the lot before dropping DUBE back off at her car a few minutes later.

136. On November 12, 2018, at approximately 5:40 p.m., JACKSON called DUBE and said, "Okay, so listen, I'm about to get a new phone . . . so I can get, have a new number, everything, whatever. Do you also want me to get you one, so you can have a new number and everything, too? Cuz I'm trying to get everybody to do it together." Based on the context and the investigation, JACKSON told DUBE that he was getting a new telephone and telephone number and asked whether she wanted one, too, since he wanted everyone to change numbers at the same time, to avoid detection by law enforcement. DUBE responded, "Yeah, yeah, but I don't have the money right this second." JACKSON responded, "Okay, but you will have it this week." DUBE responded, "Yeah." JACKSON and DUBE discussed what kind of phone plan and what type of phone DUBE wanted. JACKSON exhorted DUBE, "You only can use those phones with each other, no other phone, no nothin'. . . . When I give you this new phone, you're only gonna use that, nothing else." DUBE responded, "Yeah. Yeah yeah yeah, of course." JACKSON confirmed whether Dube knew where to go, and Dube said she had not received the instruction. JACKSON then texted, at approximately 5:43 p.m., "[Grocery Store] in Woodbridge," and

"Not amboy." At approximately 6:00 p.m., JACKSON texted DUBE, "When u get the just park by my white van." At approximately 6:02 p.m., JACKSON texted DUBE, "No rush getting the. Phones now."

137. In fact, JACKSON ceased using the JACKSON 8537 Facility on or about November 12, 2018 and began using the JACKSON 8329 Facility. The toll records for the JACKSON 8329 Facility for November 12, 2018 reveal numerous contacts with known narcotics customers of JACKSON's, but not with either of the known telephone numbers for DUBE (the DUBE 0188 Facility) or CORDOBA (the CORDOBA 5758 Facility), implying that JACKSON did, in fact, obtain new telephone numbers for DUBE and CORDOBA, as he told them he would.

***HOLIDAY***

138. The investigation has revealed that HOLIDAY purchases both heroin and cocaine from JACKSON. For instance, on July 27, 2018, HOLIDAY (using the HOLIDAY 4759 Facility) texted JACKSON (using the JACKSON 4655 Facility), "Need to see u." JACKSON responded, "What do u need  no bud," likely meaning JACKSON had no marijuana to sell. HOLIDAY responded, "1 1/2 room," and JACKSON responded, "Amboy how long," likely telling HOLIDAY he could meet in Perth Amboy and asking how long HOLIDAY would take to get there. HOLIDAY responded, "20 25 minutes." Later that day, HOLIDAY texted JACKSON, "Just 1room and a bunny," and JACKSON texted to HOLIDAY, "1 gram or a half gram." HOLIDAY responded, "X / Gram." Based on the context and the investigation, HOLIDAY likely ordered one bundle of heroin and one gram of cocaine (a "room"). JACKSON told HOLIDAY at approximately 6:37 p.m., "[convenience store] go to smith street." At approximately 6:56 p.m., law enforcement observed JACKSON and HOLIDAY meeting at a convenience store on Smith Street in Perth Amboy.

139. On August 15, 2018, HOLIDAY texted JACKSON, "Need a house." JACKSON responded, "1:00," and HOLIDAY responded, "Ok lmk where," meaning HOLIDAY asked JACKSON to let him know where to meet at 1:00. At approximately 1:09 p.m., JACKSON texted HOLIDAY, "Amboy 20 mins," and "Brick," to which HOLIDAY replied, "Yes n 1/2 room," meaning HOLIDAY confirmed that when he had ordered a "house," he meant a brick of heroin, and added that he also needed half a gram ("room") of cocaine. JACKSON told HOLIDAY to meet near the same convenience store in Perth Amboy as the Subjects had met on July 27. Law enforcement observed JACKSON and HOLIDAY meet in that vicinity at approximately 1:48 p.m.

140. On October 19, 2018, HOLIDAY texted JACKSON, "What time I can see you," to which JACKSON responded, "Around 1:30." HOLIDAY told JACKSON he would get in touch after HOLIDAY finished a medical appointment. At approximately 1:54 p.m., HOLIDAY texted JACKSON,

"Yoyoyo," and JACKSON responded, "What up what do u need." HOLIDAY responded, "4 bunnies," likely meaning four bundles of heroin, and the Subjects discussed when and where to meet. At approximately 2:35 p.m., law enforcement conducting surveillance observed JACKSON meet with HOLIDAY at the location in or around Keyport where the Subjects had discussed meeting. The Subjects conducted a hand-to-hand transaction through JACKSON's car's passenger window, while JACKSON was in the driver's seat and MEALING was in the front passenger seat.

### D. JACKSON

141. The investigation has revealed that D. JACKSON purchases cocaine from JACKSON. On September 13, 2018, D. JACKSON (using the D. JACKSON 0346 Facility) called JACKSON and said, "Can you help this motherfucker?" likely asking JACKSON if he could sell D. JACKSON narcotics. JACKSON responded, "Coming back that way." D. JACKSON responded, "Aight, hit me."

142. Later that day, JACKSON called D. JACKSON, who said, "You help this motherfucker?" JACKSON responded, "Sup?" D. JACKSON said, "This n**** Scoob was tryin' to do somethin' and shit, but I tell him I had to call to find out. He didn't say who or where or how or what, but I didn't know whether you wanted to fuck with him or not." JACKSON asked who "Scoob" was, and D. JACKSON responded, "Booby." JACKSON responded, "Oh, I mean, whatever you do, you know, you do what you do, I ain't got nothin' to do with it." D. JACKSON responded, "Oh yeah, all right, all right, Imma call and find out what he want then. I'll hit you back." JACKSON responded, "Yeah, hit me right back" because he was about to go. Based on my training and experience and the investigation, D. JACKSON was likely letting JACKSON know the identity of D. JACKSON's prospective narcotics customer before he felt comfortable telling that customer that he could sell narcotics to him.

143. Less than one minute after getting off the phone, JACKSON texted D. JACKSON, "48 is the number tho" and "For u 46," likely meaning that the price for the narcotics would ordinarily be $48 per unit, but JACKSON would sell the narcotics to D. JACKSON for $46 per unit. Based on my training and experience and the investigation, including prices that JACKSON paid to GILLENS and quoted to other narcotics customers at various points in time, I believe that JACKSON and D. JACKSON were discussing cocaine. D. JACKSON called JACKSON and said, "I need 11 of them." JACKSON responded, "All right, I heard you. I'm coming." At approximately 6:34 p.m., JACKSON texted, "5 mins." At approximately 6:47 p.m., law enforcement observed JACKSON meet with D. JACKSON in front of a residence in or around Old Bridge. After the Subjects met, D. JACKSON entered the residence.

144. On September 20, 2018, JACKSON texted D. JACKSON, "Talk to me." D. JACKSON responded, "15," likely meaning that D. JACKSON ordered 15 grams of cocaine. JACKSON replied, "Ok give me a few ok eating lunch," and D. JACKSON replied, "Tru." Later that day, JACKSON texted D. JACKSON, "At [location] I will be right there."

### SHAVAR WILLIAMS

145. The investigation has revealed that WILLIAMS purchases heroin and cocaine from JACKSON. For instance, on August 10, 2018, WILLIAMS (using the WILLIAMS 6678 Facility) texted JACKSON (using the JACKSON 4655 Facility), "2g 2buns," likely meaning WILLIAMS ordered two grams of cocaine and two bundles of heroin. JACKSON responded, "Ok." JACKSON told WILLIAMS where and when to meet. Law enforcement observed JACKSON and WILLIAMS conduct a hand-to-hand transaction at the meeting location JACKSON gave WILLIAMS.

146. On August 17, 2018, WILLIAMS texted JACKSON, "2bun 3g," meaning WILLIAMS likely ordered two bundles of heroin and three grams of cocaine. JACKSON responded, "Ok," and told WILLIAMS a time and location at which to meet. Law enforcement observed JACKSON and WILLIAMS meet at or about the time and location JACKSON gave WILLIAMS.

147. On October 19, 2018, JACKSON (using the JACKSON 8537 Facility) and WILLIAMS (using the WILLIAMS 6678 Facility) spoke, and WILLIAMS asked whether JACKSON was around. The Subjects agreed to meet in Perth Amboy. WILLIAMS texted JACKSON, "3buns 4g," meaning WILLIAMS likely ordered three bundles of heroin and four grams of cocaine. The Subjects further coordinated when and where to meet. Thereafter, law enforcement observed JACKSON and WILLIAMS meet at a location in Perth Amboy.

### BRIAN HALL

148. The investigation has revealed that HALL purchases heroin and likely cocaine from JACKSON. For instance, on August 20, 2018, HALL (using the HALL 2619 Facility) texted JACKSON (using the JACKSON 4655 Facility), "GM boss 14s what time you think I'm gonna be in amboy around 3 paying phone bill." Based on the context and the investigation, I believe HALL was ordering 14 grams of cocaine (because when he orders heroin from JACKSON, he refers to "breezys," as described below). JACKSON responded, "More like 3:45 I will be in amboy ok." At approximately 3:48 p.m., JACKSON texted, "10 mins away." At approximately 4:19 p.m., HALL texted, "You close my n****," and JACKSON responded, "Yes." HALL texted, "Got [another individual ("Individual-2")] with me." At approximately 4:27 p.m., JACKSON texted, "4 mins." At approximately 4:42 p.m., law enforcement observed JACKSON meet

at a location in Perth Amboy with a vehicle driven by Individual-2, with HALL as a passenger.

149. On August 24, 2018, HALL texted JACKSON, "GM boss 4breezys see you after 5," likely meaning HALL ordered four bricks of heroin from JACKSON. That afternoon, HALL called JACKSON and changed his order to five bricks. At approximately 5:58 p.m., HALL called JACKSON, who said he was at a particular fast food restaurant. HALL stated he was coming over the bridge now. At approximately 6:04 p.m., law enforcement observed JACKSON and HALL meet at or near the fast food restaurant in Perth Amboy to which JACKSON had earlier directed HALL.

150. On August 26, 2018, JACKSON texted HALL, "Will give u new number 2 marrow." In fact, the following day, JACKSON discontinued using the JACKSON 4655 Facility and began using the JACKSON 8569 Facility for narcotics transactions. Toll records indicate that the HALL 2619 Facility was among the first numbers the JACKSON 8569 Facility texted after its inception on or about August 27, 2018.

151. On September 24, 2018, HALL called JACKSON (using the JACKSON 8569 Facility) and complained that "my fuckin' man, the only one I had left, took off and checked theirself into a fuckin' rehab and didn't even tell nobody." JACKSON responded, "He'll be back." HALL responded, "Word is bond. I'm like, I can't believe this shit." JACKSON responded, "But that's what they do."

152. On October 29, 2018, JACKSON (using the JACKSON 8537 Facility) had a call lasting more than 10 minutes with HALL (using the HALL 2619 Facility), in which Hall informed Jackson that an individual ("Individual-3") they both knew had recently been arrested. HALL stated, "they got him on some slick shit. State Police pulled him over, I don't know where, but they pulled him over on the highway somewhere and they found weed on him. They didn't arrest him. They issued him a summons, but two days later, they raided his house." HALL speculated that certain individuals who had recently been arrested might be cooperating with law enforcement, based on the timing of other individuals' arrests. HALL stated, "I'm not fuckin' wit' 'em, I mean, I never did on that level anyway, but you know, a lot of shit, you know what I'm saying, so I said let me give Mike"—likely referring to JACKSON—"a call because I don't know whether he's fuckin' with [the arrestee] or not." JACKSON said, "nah," likely meaning that he was not currently doing business with Individual-3.

153. JACKSON speculated with HALL about what must have happened to give "them the probable cause to go up in there," meaning, how did law enforcement obtain probable cause to obtain a search warrant at Individual-3's residence. HALL said, "or they had been watchin' him and they say okay, now

we found some weed, now we found a reason to go up in there." JACKSON responded, "Just cause they found weed in his car, that don't give 'em probable cause to raid his house. . . . For somebody to get probable cause to raid your house, you gotta sell out your house." JACKSON stated that "a lot of times when they raid your house . . . they know it's in there, that's why they raid. They don't just raid, not knowin' it's in there because they don't want to take that chance." Based on the context and the investigation, HALL likely stated that he wanted to warn JACKSON that an individual JACKSON knew and with whom JACKSON might be engaging in narcotics transactions had recently been arrested and might be cooperating with law enforcement. The defendants likely then discussed whether law enforcement might have further information about Individual-3 and what information law enforcement needs in order to get a search warrant for a residence.

154. On November 2, 2018, HALL texted JACKSON, "[Individual-3] a snitch word is bond." JACKSON called HALL a few minutes later, and the defendants continued to discuss Individual-3's arrest and speculate that Individual-3 was cooperating with law enforcement. The defendants further discussed that Individual-3 had recently called "Mac" (believed to be defendant D. JACKSON), which the defendants found suspicious. JACKSON discussed the prospect of cutting off (ceasing to deal narcotics to) individuals who may have been engaging in narcotics transactions with Individual-3, based on the concern that Individual-3 might be cooperating with law enforcement.

2019V00253 /JMA/jw
CRAIG CARPENITO
United States Attorney
By:  Jordan M. Anger
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel:  (973) 645-2829
Fax: (973) 297-2042
Jordan.Anger@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | **Hon.** |
| **Plaintiff,** | **:** | **Civil Action No. 19-** |
| **v.** | **:** | |
| | | **WARRANT FOR ARREST** *IN REM* |
| **ONE 2015 JEEP WRANGLER, VIN 1C4HJWEG5FL589336;** | **:** | |
| **ONE 2017 POLARIS SLINGSHOT SL, VIN 57XAAPFA3H8124858;** | | |
| **ONE 2015 HARLEY DAVIDSON FLHXSE CVO STREET GLIDE, VIN 1HD1PXN1XFB958701;** | | |
| **ONE 2014 JEEP GRAND CHEROKEE OVERLAND, VIN 1C4RJFCT4EC211415; AND** | | |
| **$20,316.00 IN U.S. CURRENCY,** | | |
| **Defendants *in rem.*** | | |

**TO ANY OFFICER OF THE UNITED STATES DEPARTMENT OF JUSTICE, THE FEDERAL BUREAU OF INVESTIGATION, AND/OR ANY OTHER DULY AUTHORIZED LAW ENFORCEMENT OFFICER:**

WHEREAS, a Verified Complaint for Forfeiture *in Rem* has been filed on May 20, 2019 in the United States District Court for the District of New Jersey, alleging that the defendant property, namely one 2015 Jeep Wrangler, VIN 1C4HJWEG5FL589336, one 2017 Polaris Slingshot SL, VIN 57XAAPFA3H8124858, one 2015 Harley Davidson FLHXSE CVO Street Glide, VIN 1HD1PXN1XFB958701, one 2014 Jeep Grand Cherokee Overland, VIN 1C4RJFCT4EC211415, and $20,316.00 in United States Currency, is subject to seizure and forfeiture to the United States for the reasons set forth in the Complaint;

WHEREAS, the defendant property is currently in the possession, custody, or control of the United States;

WHEREAS, in these circumstances, Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Federal Rules of Civil Procedure (the "Supplemental Rules"), directs the Clerk of the Court to issue a Warrant for Arrest *in Rem* for the defendant property; and

WHEREAS, Rule G(3)(c)(i) of the Supplemental Rules provides that the Warrant for Arrest *in Rem* must be delivered to a person or organization authorized to execute it, who may be an agent with the United States Department of Justice or any other United States officer or employee; someone under contract with the United States; or someone specially appointed by the court for that purpose.

YOU ARE, THEREFORE, HEREBY COMMANDED to take such steps as are necessary to arrest and detain the defendant property, including, if appropriate, serving a copy of this warrant on the custodian in whose possession, custody, or control the property is currently found; and

YOU ARE FURTHER COMMANDED to use whatever means may be appropriate to protect and maintain the defendant property in your custody until further order of this Court.

IN WITNESS WHEREOF, I, the Clerk of the United States District Court for the District of New Jersey, have caused the foregoing Warrant for Arrest *In Rem* to be issued pursuant to Rule G(3)(b)(i) of the Supplemental Rules.

Dated: _____

_____
Clerk of the Court

By: _____
Deputy Clerk

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jordan M. Anger, Assistant U.S. Attorney
United States Attorney's Office, 970 Broad St., Suite 700
Newark, New Jersey 07102   Tel.: (973) 645-2829

## DEFENDANTS
One 2015 Jeep Wrangler; One 2017 Polaris Slingshot SL; One 2015 Harley Davidson FLHXSE CVO Street Glide; One 2014 Jeep Grand Cherokee Overland; and $20,316.00 in United States Currency

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
      Plaintiff

☐ 2   U.S. Government
      Defendant

☐ 3   Federal Question
      *(U.S. Government Not a Party)*

☐ 4   Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                         *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
      Proceeding

☐ 2   Removed from
      State Court

☐ 3   Remanded from
      Appellate Court

☐ 4   Reinstated or
      Reopened

☐ 5   Transferred from
      Another District
      *(specify)*

☐ 6   Multidistrict
      Litigation -
      Transfer

☐ 8   Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. 881(a)
Brief description of cause:
forfeiture action against property related to a controlled substances violation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE   Brian Martinotti
DOCKET NUMBER   18-mc-167; 19-cr-359

DATE
05/20/2019

SIGNATURE OF ATTORNEY OF RECORD
s/Jordan M. Anger

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE